# IN THE SUPREME COURT OF TEXAS

No. 13-0497

G.T. LEACH BUILDERS, LLC, ET AL.,
PETITIONERS,

v.

SAPPHIRE V.P., LP,
RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS

**Argued November 5, 2014**

JUSTICE BOYD delivered the opinion of the Court.

Texas law encourages parties to resolve disputes through arbitration,[1] but it will not force them to arbitrate unless they have agreed to that alternative.[2] If they have, or if they are equitably estopped from denying their assent to such an agreement, courts must honor the agreement by referring the disputes to arbitration unless the party demanding arbitration has waived that right by substantially participating in the litigation. We apply these principles in this case to determine whether a property developer must arbitrate its claims against several defendants involved in a construction project. The trial court denied all of the defendants' motions to compel arbitration,

---

[1] "It is the policy of this state to encourage the peaceable resolution of disputes . . . through voluntary settlement procedures," including binding and nonbinding arbitration. TEX. CIV. PRAC. & REM. CODE §§ 154.002, 154.027.

[2] "A court shall order the parties to arbitrate on application of a party showing . . . an agreement to arbitrate;" otherwise, "the court shall deny the application." *Id.* § 171.021(a)(1), (b).

and the court of appeals affirmed. We hold that (1) the developer agreed to arbitrate its claims against the general contractor and the general contractor did not waive its right to demand arbitration; (2) the developer's argument that a contractual deadline bars the general contractor's demand for arbitration is itself a claim that must be arbitrated; (3) the developer did not agree in the general contract to arbitrate its claims against the other defendants; (4) the developer is not equitably estopped from denying any such agreement; and (5) the subcontracts do not contain an enforceable arbitration agreement. In short, we hold that the developer must arbitrate its claims against the general contractor but not its claims against the other defendants.

**I.**
**Background**

In July 2008, Hurricane Dolly caused extensive damage to a luxury condominium project that Sapphire V.P., L.P. was in the process of developing on South Padre Island. Sapphire filed suit against Adams Insurance Services, Inc., Arthur J. Gallagher Risk Management, and Tracy Williams (collectively, the Insurance Brokers), asserting claims for negligence and breach of contract. Sapphire alleged that, eight days before the hurricane hit, the Insurance Brokers allowed a builder's risk insurance policy to expire and be replaced by a permanent insurance policy even though construction of the project was not yet complete. Sapphire sought to recover millions of dollars for water damage, increased construction costs, delay costs, lost revenue, and other losses that the builder's risk policy allegedly covered or should have covered but the permanent policy did not.

More than two-and-a-half years after the hurricane struck, the Insurance Brokers designated several others as responsible third parties: (1) the project's general contractor, G.T. Leach Builders, L.L.C.; (2) two of G.T. Leach's subcontractors, Power Design, Inc. and Atlas

2

Comfort Systems USA, LLC[3] (collectively, the Subcontractors); and (3) an engineering contractor, CHP & Associates Consulting Engineers, Inc., and its employee Mark Janneck (collectively, the Engineers).[4] Sapphire, in turn, promptly amended its petition to name these parties as defendants, alleging that their negligence and contractual breaches resulted in construction defects that caused the condominium project to sustain the water damage that resulted in the uncovered losses. Although Sapphire asserted these claims within the four-year statute of limitations applicable to claims for breach of contract, the two-year statute of limitations on negligence claims had already expired. At that time, however, Texas law allowed a claimant to assert claims against a party designated as a responsible third party even though the statute of limitations barred the claim.[5]

After pursuing pretrial motions and participating in discovery, G.T. Leach—the general contractor—moved to compel arbitration and stay the litigation, relying on an arbitration agreement contained in its general contract with Sapphire. The Insurance Brokers, Subcontractors, and Engineers (collectively, the Other Defendants) subsequently filed similar motions, also relying on the arbitration agreement in the general contract, even though they never signed that contract. The Subcontractors relied, in addition, on language in their subcontracts with G.T. Leach, even though Sapphire never signed the subcontracts. The trial court denied all of the motions without

---

[3] Atlas Comfort is now known as Comfort Systems USA—South Central.

[4] Sapphire initially filed two separate lawsuits, one against the Insurance Brokers and another against the architects who designed the project. The architects first named G.T. Leach, the Subcontractors, and the Engineers as responsible third parties, and Sapphire amended its pleadings to name them as defendants in that suit. When the Insurance Brokers learned of these developments in that suit, they named G.T. Leach, the Subcontractors, and the Engineers as responsible third parties in this suit. The architects later settled and resolved all claims asserted by and against them.

[5] *See* Act of May 4, 1995, 74th Leg., R.S., ch. 136, § 1, sec. 33.004(e), 1995 Tex. Gen. Laws 971, 973, *amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 4.04, sec. 33.004(e), 2003 Tex. Gen. Laws 847, 856, *repealed by* Act of May 24, 2011, 82d Leg., R.S., ch. 203, § 5.02, sec. 33.004(e), 2011 Tex. Gen. Laws 757, 759.

explaining its reasons. The defendants pursued an interlocutory appeal, the court of appeals affirmed,[6] and we granted the defendants' petitions for review.[7]

## II.
## G.T. Leach

We first consider whether G.T. Leach can compel arbitration. In the general contract, G.T. Leach and Sapphire agreed that "[a]ny Claim arising out of or related to the Contract . . . shall . . . be subject to agreed private arbitration" and "shall be decided by binding arbitration."[8] Sapphire concedes that this is a valid arbitration agreement and that it applies to Sapphire's claims against G.T. Leach, but contends that G.T. Leach expressly and impliedly waived its right to demand arbitration. Alternatively, Sapphire argues that G.T. Leach failed to demand arbitration prior to a deadline that the contract expressly imposes. The court of appeals agreed with Sapphire's second argument and did not reach its first. We conclude that (1) G.T. Leach did not waive its arbitration

---

[6] ___ S.W.3d ___.

[7] Although we generally lack jurisdiction over interlocutory appeals, *see* TEX. GOV'T CODE § 22.225(b)(3), we have jurisdiction to review a court of appeals' interlocutory judgment when its holding creates an inconsistency with prior precedent "that should be clarified to remove unnecessary uncertainty in the law and unfairness to litigants." *Id*. § 22.225(c), (e); *see also Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*, 392 S.W.3d 633, 635 n.3 (Tex. 2013) (per curiam) ("We have jurisdiction to hear an appeal from an interlocutory order denying arbitration when the court of appeals' decision conflicts with prior precedent."). In this case, the court of appeals' holding creates such an inconsistency with our decision in *Perry Homes v. Cull*, 258 S.W.3d 580, 587–92 (Tex. 2008), and with the court of appeals' decision in *In re Global Constr. Co.*, 166 S.W.3d 795, 798–99 (Tex. App.—Houston [14th Dist.] 2005, orig. proceeding), regarding the issue of whether courts or arbitrators should decide whether a contractual deadline bars a demand for arbitration. The inconsistency on this issue gives us jurisdiction, which permits us to address and resolve all of the issues that all of the parties raise in this case. *See, e.g.*, *Brown v. Todd*, 53 S.W.3d 297, 301 (Tex. 2001) ("As we have repeatedly recognized, if our jurisdiction is properly invoked on one issue, we acquire jurisdiction of the entire case.").

[8] The general contract utilized a "Standard Form of Agreement Between Owner and Contractor" (Form A111-1997) and a form of "General Conditions of the Contract for Construction" (Form A201-1997), both published by the American Institute of Architects. Sapphire and G.T. Leach substantially revised these forms, however, by striking and adding language throughout the contract to reflect their specific agreements. As revised, the arbitration section addresses numerous details including the process for selecting the arbitrator(s), the rules governing the arbitration, the location and timing of the arbitration, rights to discovery, finality and appeals from the arbitration award, and the duty to continue performing under the contract while the arbitration is pending. As discussed further below, one section addresses the consolidation and joinder of other parties within the arbitration proceeding.

rights, and (2) the issue of whether the contractual deadline bars G.T. Leach's demand for arbitration is one that the arbitrators—not the courts—must decide. Because the waiver argument challenges G.T. Leach's ability to rely on the arbitration agreement at all, we address it first.

## A.      Waiver of Right to Arbitration

Sapphire asserts that G.T. Leach has waived its right to enforce their arbitration agreement. Waiver—the "intentional relinquishment of a known right"—can occur either expressly, through a clear repudiation of the right, or impliedly, through conduct inconsistent with a claim to the right. *Perry Homes*, 258 S.W.3d at 590–91, 594; *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 6 (Tex. 2014). Sapphire argues that G.T. Leach both expressly and impliedly waived its right to compel arbitration in this case. The trial court agreed and denied G.T. Leach's motion to compel arbitration, but the court of appeals did not reach the issue. Both parties have fully briefed the issue and urge us to decide it here. When, as here, the relevant facts are undisputed, whether a party waived its right to arbitrate is a question of law. *Kennedy Hodges, L.L.P. v. Gobellan*, 433 S.W.3d 542, 545 (Tex. 2014) (per curiam); *Perry Homes*, 258 S.W.3d at 598 & n.102. At the parties' mutual request, we reach the issue here to avoid unnecessary delay. *See, e.g.*, *Placencio v. Allied Indus. Int'l, Inc.*, 724 S.W.2d 20, 22 (Tex. 1987) (reaching, rather than remanding, issue of law not reached by court of appeals "[t]o avoid unnecessary delay"). Based on the undisputed facts, we conclude that G.T. Leach has not waived its right to arbitration.

### 1.      Express Waiver

Sapphire first argues that G.T. Leach expressly waived its arbitration rights by seeking a continuance and agreeing to a new trial date. Specifically, Sapphire notes that G.T. Leach filed (jointly with the other defendants) a motion for continuance stating that "there is insufficient time for the parties to prepare this case with the current trial setting" and discovery "cannot be

5

completed prior to the current trial setting." When the parties agreed to postpone the trial setting, G.T. Leach then signed a Rule 11 agreement in which all parties agreed to a scheduling order and a new trial date. We do not agree that the statements contained in these documents expressly relinquish and repudiate a right to arbitration. As we explained when addressing nearly identical statements in *In re Fleetwood Homes of Texas, L.P.*, "[n]othing in [these statements] expressly waives arbitration or revokes [an] arbitration demand." 257 S.W.3d 692, 694 (Tex. 2008); *see also In re Bank One, N.A.*, 216 S.W.3d 825, 827 (Tex. 2007) (per curiam) (holding that filing of motion to set aside default judgment and set new trial date does not expressly waive arbitration rights). Although the acts of requesting and then agreeing to a new trial date could be inconsistent with an intent to exercise the right to arbitrate, they do not constitute an *express* waiver of that right.

### 2.       Implied Waiver

A party asserting implied waiver as a defense to arbitration has the burden to prove that (1) the other party has "substantially invoked the judicial process," which is conduct inconsistent with a claimed right to compel arbitration, and (2) the inconsistent conduct has caused it to suffer detriment or prejudice. *Perry Homes*, 258 S.W.3d at 593–94; *see also Gobellan*, 433 S.W.3d at 545. Because the law favors and encourages arbitration, "this hurdle is a high one." *Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*, __ S.W.3d __, __ (Tex. 2014) (per curiam) (quoting *Perry Homes*, 258 S.W.3d at 589–90). We conclude that Sapphire has not cleared the hurdle in this case.

### a.       Litigation Conduct

Whether a party has substantially invoked the judicial process depends on the totality of the circumstances. *Perry Homes*, 258 S.W.3d at 589–90. Courts consider a "wide variety" of factors, including:

6

- how long the party moving to compel arbitration waited to do so;

- the reasons for the movant's delay;

- whether and when the movant knew of the arbitration agreement during the period of delay;

- how much discovery the movant conducted before moving to compel arbitration, and whether that discovery related to the merits;

- whether the movant requested the court to dispose of claims on the merits;

- whether the movant asserted affirmative claims for relief in court;

- the extent of the movant's engagement in pretrial matters related to the merits (as opposed to matters related to arbitrability or jurisdiction);

- the amount of time and expense the parties have committed to the litigation;

- whether the discovery conducted would be unavailable or useful in arbitration;

- whether activity in court would be duplicated in arbitration;

- when the case was to be tried.

*Perry Homes*, 258 S.W.3d at 590–91.

Sapphire first initiated this lawsuit against the Insurance Brokers in 2009. In the summer of 2010, it filed a separate lawsuit in Harris County, Texas, against the architects who designed the condominium project, seeking to recover essentially the same damages arising from Hurricane Dolly. Six months later, Sapphire added G.T. Leach to the Harris County lawsuit, and four months after that, Sapphire named G.T. Leach as a defendant in this lawsuit. G.T. Leach moved to compel arbitration the following November. Sapphire asserts that G.T. Leach's actions in this case between May 2011 and November 2012 amount to waiver of any right it has to arbitrate Sapphire's claims. Sapphire contends that G.T. Leach waived its arbitration rights through its actions between May 2011 and November 2012, primarily by filing counterclaims, filing motions for relief, and participating in pretrial discovery. "Merely taking part in litigation," however, "is not enough." *In*

7

*re D. Wilson Constr. Co.*, 196 S.W.3d 774, 783 (Tex. 2006) (citations omitted). Rather, that conduct must demonstrate that the party "has substantially invoked the judicial process to [its] opponent's detriment." *Id.* (citing *In re Vesta Ins. Grp., Inc.*, 192 S.W.3d 759, 762 (Tex. 2006) (per curiam)).

In considering the relevant factors, we note first that G.T. Leach did not elect to resolve its disputes with Sapphire in court; rather, it is in this lawsuit because Sapphire sued it. *See Perry Homes*, 258 S.W.3d at 591 (noting that one factor is whether party seeking arbitration was plaintiff who chose to file suit or defendant responding to suit filed against it). Although G.T. Leach asserted a counterclaim against Sapphire in the Harris County suit, it did not assert counterclaims seeking affirmative relief in this lawsuit. The counterclaim G.T. Leach filed in Harris County was defensive in nature, and our rules required G.T. Leach to file it or risk losing it altogether. *See* TEX. R. CIV. P. 97(a) (defining compulsory counterclaims). We have held that "[m]erely filing suit does not waive arbitration," *Richmont Holdings*, __ S.W.3d at __, and we have declined to find waiver of the right to arbitrate when a movant filed cross-actions in litigation, *see D. Wilson Constr.*, 196 S.W.3d at 783. Moreover, G.T. Leach never sought disposition of its Harris County counterclaim on the merits; instead it merely took the action necessary to preserve that claim once Sapphire initiated a lawsuit arising out of the same subject matter. Nor did G.T. Leach ever seek summary judgment or dismissal of Sapphire's claims on the merits. *See Richmont Holdings*, __ S.W.3d at __ (observing that whether movant sought "disposition on the merits" is key factor in deciding waiver); *see also Perry Homes*, 258 S.W.3d at 592 (observing that "whether the movant sought judgment on the merits" is a factor).

Instead, G.T. Leach first and primarily sought to transfer venue of this case to Harris County, or alternatively to abate this case while the Harris County case was resolved. Rather than

8

driving up litigation costs—another factor courts consider for waiver—G.T. Leach endeavored to create efficiency by defending Sapphire's claims in a single venue. *Perry Homes*, 258 S.W.3d at 591. We have rejected arguments relying on venue challenges to establish waiver because such challenges do not relate to the merits of the case. *See Richmont Holdings*, __ S.W.3d at __ (also noting that under rules of procedure, "objections to improper venue must be made at the outset of the case"); *In re Serv. Corp. Int'l*, 85 S.W.3d 171, 175 (Tex. 2002) (holding that parties did not waive right to arbitrate by seeking to move litigation from state to federal court); *In re ADM Investor Servs., Inc.*, 304 S.W.3d 371, 374 (Tex. 2010) (applying *Perry Homes* test in context of forum-selection clauses and holding that motion to transfer venue did not waive contractual right).

In addition to its venue challenge, G.T. Leach filed motions to designate responsible third parties, for continuance, and to quash depositions. These motions, however, were defensive, rather than offensive, in nature. A party's litigation conduct aimed at defending itself and minimizing its litigation expenses, rather than at taking advantage of the judicial forum, does not amount to substantial invocation of the judicial process. *See Richmont Holdings*, __ S.W.3d at __; *see also Keytrade USA, Inc. v. Ain Temouchent M/V*, 404 F.3d 891, 897 (5th Cir. 2005) (declining to find waiver where movant sought summary judgment "from a defensive posture"); *Rodriguez v. Transnave Inc.*, 8 F.3d 284, 288 (5th Cir. 1993) (declining to find waiver where movant voluntarily appeared in suit and sought removal because it was "purely defensive action to preserve its right of removal and to avoid any possibility of a default judgment").

Finally, G.T. Leach participated in pretrial discovery, but it did so because Sapphire engaged it in discovery. Sapphire complains that because the parties agreed to conduct discovery jointly for both cases, all discovery propounded by any party was available to all parties, such that G.T. Leach has received copies of documents produced by other parties and transcripts of

9

depositions taken by other parties. Sapphire asserts that G.T. Leach acted inconsistently with its right to arbitrate both when it responded to discovery requests and when it resisted discovery by seeking to quash a deposition notice. Responding to discovery and simply being named in the lawsuit while discovery is ongoing do not amount to waiver. To the contrary, we have declined to find waiver even when the movant itself propounded written discovery. *See, e.g.*, *Fleetwood Homes*, 257 S.W.3d at 694; *In re Bruce Terminix, Co.*, 988 S.W.2d 702, 703–04 (Tex. 1998); *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 88–89 (Tex. 1996). Nor does G.T. Leach's motion to quash, in which it objected to the time and place of a deposition notice served on it by Sapphire, amount to an affirmative invocation of the judicial forum.

The only discovery that G.T. Leach actually propounded was a form request for disclosure that G.T. Leach included in its answer in the case. *See* TEX. R. CIV. P. 194.1 (providing required form for requests for disclosure). Such requests seek basic information about a lawsuit: who are the parties and witnesses, what are the theories, and how much is at stake? A defendant needs this information to make intelligent decisions about how to defend the suit, and as we have stated, a party may protect its existing litigation rights from forfeiture without waiving its right to arbitration. We have declined to find waiver of the right to arbitrate in other cases where the movant made a request for disclosure. *See Richmont Holdings*, __ S.W.3d at __; *Vesta Ins.*, 192 S.W.3d at 763.

G.T. Leach also designated experts and responsible third parties, but these actions were also defensive in nature and necessary to preserve G.T. Leach's rights. If G.T. Leach had failed to timely designate experts, it would have forfeited the right to present expert witnesses if the suits went to trial. *See* TEX. R. CIV. P. 193.6(a). Likewise, G.T. Leach had to designate responsible third parties by the deadline imposed in the scheduling order. G.T. Leach did not create the need to

10

timely designate experts and responsible third parties by agreeing to a scheduling order: the rules of civil procedure impose a default deadline for expert designations when the court has not set one, and the Civil Practice and Remedies Code imposes a deadline for designating responsible third parties. TEX. R. CIV. P. 195.2; TEX. CIV. PRAC. & REM. CODE § 33.004(a).

While we agree that G.T. Leach could have been more prompt in seeking arbitration, most of the delay of which Sapphire complains occurred either during the eighteen months before Sapphire added G.T. Leach to this case or during the four-plus months during which G.T. Leach sought to transfer venue. *See* TEX. R. CIV. P. 86 (governing order of pleadings for motion to transfer venue). The delay between the trial court's denial of the motion to transfer venue and G.T. Leach's motion to compel arbitration was between two and three months. We conclude that three months is not a substantial delay relative to the timeline of this case as a whole. *Cf. Fleetwood Homes*, 257 S.W.3d at 694 (no waiver despite eight-month delay); *Vesta Ins.,* 192 S.W.3d at 763 (no waiver despite two-year delay).

Considering the totality of the circumstances, we hold that G.T. Leach has not substantially invoked the litigation process in contravention of its contractual right to arbitration. *See Perry Homes*, 258 S.W.3d at 589–90 (adopting totality-of-the-circumstances test). As in several cases involving similar or greater participation in litigation than occurred here, we decline to find waiver under these circumstances. *See Richmont Holdings*, __ S.W.3d at __ (holding that movant did not waive arbitration rights by initiating lawsuit, invoking forum-selection clause, moving to transfer venue, propounding request for disclosure, and waiting nineteen months after being sued to move for arbitration); *Fleetwood Homes*, 257 S.W.3d at 694 (holding that movant did not waive arbitration rights by noticing deposition, serving written discovery, and waiting eight months to move for arbitration); *Bruce Terminix*, 988 S.W.2d at 703–04 (holding that movant did not waive

11

arbitration rights by propounding requests for production and interrogatories and waiting six months to seek arbitration); *Mancias*, 934 S.W.2d at 88–89 (holding that movant did not waive arbitration rights by propounding written discovery, noticing deposition, agreeing to reset trial date, and waiting nearly a year to move for arbitration).

### b.    Prejudice

Nor has Sapphire proven that it suffered unfair prejudice as a result of G.T. Leach's litigation conduct. Detriment or prejudice, in this context, refers to an "inherent unfairness caused by a 'party's attempt to have it both ways by switching between litigation and arbitration to its own advantage.'" *In re Citigroup Global Mkts., Inc.*, 258 S.W.3d 623, 625 (Tex. 2008) (per curiam) (quoting *Perry Homes*, 258 S.W.3d at 597). Prejudice may result when a party seeking arbitration first sought to use the judicial process to gain access to information that would not have been available in arbitration, but propounding discovery will not, in and of itself, result in waiver of a right to compel arbitration. *Bruce Terminix*, 988 S.W.2d at 704. Similarly, while delay may be a factor both in terms of whether the movant has substantially invoked the judicial process and whether the nonmovant has suffered prejudice, mere delay is not ordinarily enough, even if it is substantial. *Richmont Holdings*, __ S.W.3d at __ ; *see also Fleetwood Homes*, 257 S.W.3d at 694 (eight-month delay); *Vesta Ins.*, 192 S.W.3d at 763 (two-year delay). "Waiver can be implied from a party's unequivocal conduct, but not by inaction." *ADM Investor*, 304 S.W.3d at 374 (citing *Perry Homes*, 258 S.W.3d at 593).

G.T. Leach may have had access to more information as a result of this litigation than if Sapphire's dispute with G.T. Leach had originated in arbitration. But Sapphire, not G.T. Leach, chose to initiate this suit in the courts rather than arbitration, and G.T. Leach did not serve a single request for production, interrogatory, or deposition notice in the case. Sapphire's contention (discussed below) that it has been prejudiced by the delay because the contractual deadline for

12

initiating arbitration expired before G.T. Leach moved to compel arbitration is unavailing because that deadline expired before Sapphire even named G.T. Leach a party to this suit.

In summary, although we agree that G.T. Leach could have demanded waiver more promptly than it did, we hold that the totality of the circumstances do not establish that G.T. Leach substantially invoked the judicial process to the extent required to demonstrate a waiver of its right to arbitration, and its participation in the litigation has not caused Sapphire the kind of prejudice necessary to clear the "high hurdle" of waiver. We thus conclude that G.T. Leach has not impliedly waived its right to demand arbitration in this case.

## B.    Contractual Deadline

We now turn to Sapphire's contention that a contractual deadline bars G.T. Leach's arbitration demand. The deadline at issue provides that any

> demand for arbitration shall be made within . . . a reasonable time after the Claim has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such Claim would be barred by the applicable statute of limitations as determined pursuant to Section 13.7.

The court of appeals agreed with Sapphire that this deadline bars G.T. Leach's demand for arbitration because the statute of limitations had run on Sapphire's claims by the time G.T. Leach made its demand.[9] G.T. Leach argues that the court should not have addressed the contractual

---

[9] By the time Sapphire named G.T. Leach as a defendant—and thus by the time G.T. Leach filed its motion to compel arbitration—the two-year statute of limitations applicable to Sapphire's negligence claims had already run, but the four-year statute applicable to Sapphire's breach-of-contract claims had not. The court of appeals did not mention this distinction, but instead stated broadly that "[t]he parties do not dispute that the applicable statute of limitations had expired when G.T. Leach sought arbitration." ___ S.W.3d at ___ n.6; *see also id*. at ___ (stating that "G.T. Leach does not contest that the statute of limitations for Sapphire's claims had expired when it filed its motion to compel arbitration."). These statements were incorrect. Although the parties did agree that the two-year statute on Sapphire's negligence claims had expired, they also agreed that the four-year statute on Sapphire's breach-of-contract claims had not. Since we conclude that the arbitrators must resolve Sapphire's contractual-deadline arguments, however, we need not consider the court of appeals' error on this point, and we leave it to the arbitrators to resolve all issues related to the construction and application of the contractual deadline in this case.

deadline at all, because Sapphire's contention that the deadline bars G.T. Leach's arbitration demand is itself an issue that Sapphire agreed to resolve through arbitration. In other words, G.T. Leach argues that only the arbitrators—and not the courts—can decide whether the contractual deadline bars G.T. Leach's demand for arbitration. In response, Sapphire asserts that G.T. Leach waived this argument by failing to raise it in the trial court or the court of appeals. We conclude that G.T. Leach did not waive the argument, and we agree that the courts must defer to the arbitrators to determine the meaning and effect of the contractual deadline.

### 1. Waiver

Sapphire contends that G.T. Leach waived its argument that only the arbitrators can decide Sapphire's contractual-deadline defense because G.T. Leach failed to raise the argument in the trial court or in the court of appeals. In support, Sapphire relies on our well-established error-preservation rules, which preclude a party from seeking appellate review of an issue that the party did not properly raise in the trial court. *See* TEX. R. APP. P. 33.1(a)(1) ("As a prerequisite to presenting a complaint for appellate review, the record must show that . . . the complaint was made to the trial court . . . ."); *see also In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003) (listing cases for proposition that "error [must be] preserved in the trial court").[10] These rules do not apply here, however, because Sapphire first raised its contractual-deadline defense in the court of appeals, not in the trial court. Under our rules, an issue presented in a petition for review to this Court must have "been preserved for appellate review in the trial court and assigned as error in the court of

---

[10] Sapphire cites to *Parks v. Developers Surety & Indemnity Co.*, 302 S.W.3d 920, 924 (Tex. App.—Dallas 2010, no pet.) (refusing to consider unconscionability as a defense to contract claim because the defendant failed to plead and assert it in the trial court), and *Posey v. Southwestern Bell Yellow Pages, Inc.*, 878 S.W.2d 275, 281 (Tex. App.—Corpus Christi 1994, no writ) ("Because the Poseys failed to assert in the court below that the limitation of liability clause was void, unconscionable or unenforceable, we may not reverse that portion of the summary judgment on appeal.").

14

appeals," but *only* "[i]f the matter complained of originated in the trial court." Tᴇx. R. Aᴘᴘ. P. 53.2(f).

In the trial court, Sapphire argued only that G.T. Leach waived its right to arbitration by participating in the litigation. The only time Sapphire referred to the contractual deadline in the trial court was to support its waiver-by-litigation defense and, in particular, its contention that G.T. Leach's participation in the litigation was prejudicial to Sapphire.[11] Sapphire never asserted in the trial court that the contractual deadline independently bars G.T. Leach's arbitration demand. G.T. Leach thus had no reason to argue in the trial court that the arbitrators, rather than the court, must resolve that assertion. On this point, there was no error for G.T. Leach to preserve in the trial court.

Sapphire first relied on the contractual deadline as an independent bar to G.T. Leach's arbitration demand in its appellee's brief in the court of appeals, and the error that G.T. Leach now complains of (i.e., that the court of appeals should not have decided that issue) first arose from the court of appeals' judgment. Although G.T. Leach could have made this argument in its reply brief or in a motion for rehearing in the court of appeals,[12] our rules do not require petitioners to have

[11] Specifically, Sapphire argued: "The most prejudicial aspect of allowing arbitration this late in the game is that the Statute of Limitations has already run on all of Plaintiff's negligence claims against all Defendants. This effect is so prejudicial that the express language of the contract prohibits arbitration in this situation."

[12] Although G.T. Leach did not specifically argue in the court of appeals that the arbitrators must decide the contractual-deadline issue, it did more broadly assert that "there is no legitimate issue as to the arbitrability of all of the issues between Sapphire and GTL," and "[b]ecause all of Sapphire's claims against [G.T. Leach] are clearly arbitrable under a valid and enforceable arbitration provision, the only potentially viable argument Sapphire presents against enforcement is waiver." Because "disposing of appeals for harmless procedural defects is disfavored," and "[a]ppellate briefs are to be construed reasonably, yet liberally, so that the right to appellate review is not lost by waiver," *Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008) (per curiam), G.T. Leach's broad assertions were arguably sufficient to encompass all supporting arguments, including the argument that Sapphire's claim that the contractual deadline bars G.T. Leach's arbitration demand was "clearly arbitrable." *See, e.g.*, *Plexchem Int'l, Inc. v. Harris Cnty. Appraisal Dist.*, 922 S.W.2d 930, 930–31 (Tex. 1996) (holding that the assertion in the court of appeals that "[t]he trial court erred by granting . . . summary judgment" was "sufficient to preserve error and to allow argument as to all possible grounds upon which summary judgment should have been denied"); *see also* Tᴇx. R. Aᴘᴘ. P. 38.1(f) ("The statement of an issue or point [in an appellate brief] will be treated as covering every subsidiary question that is fairly included."). We need not decide that issue, however, since we conclude that G.T. Leach did not waive its argument even if it failed to raise it in the court of appeals.

15

made in the court of appeals all arguments that are responsive to arguments that a respondent raised for the first time in that court. *See Key Operating & Equip., Inc. v. Hegar*, 435 S.W.3d 794, 797 (Tex. 2014) ("An issue raised in this Court must have been assigned as error in the court of appeals *if it originated in the trial court*.") (emphasis added). Instead, we have held that when the petitioner's argument or complaint first arises "from the court of appeals' judgment," it "may be raised either in a motion for rehearing in the court of appeals or in a petition for review in this Court." *Bunton v. Bentley*, 153 S.W.3d 50, 53 (Tex. 2004) (holding that petitioner's "complaint that the exemplary damages were unconstitutionally excessive arose from the court of appeals' judgment and may therefore be raised in this Court for the first time") (citing *Larsen v. FDIC/Manager Fund*, 835 S.W.2d 66, 74 n.12 (Tex. 1992)).

Our decision in *Gilbert Texas Construction, L.P. v. Underwriters at Lloyd's London* illustrates this point. 327 S.W.3d 118, 125 (Tex. 2010). In that case, Gilbert sued Underwriters for breach of contract after Underwriters denied coverage of Gilbert's insurance claim. On cross-motions for summary judgment, the trial court agreed with Gilbert, and having won on the issue of coverage, Gilbert had no obligation to preserve any error in the trial court's judgment. *Id.* Underwriters appealed, however, and argued in the court of appeals that an exclusion to the policy's coverage applied. In that court, Gilbert did not dispute that the exclusion applied, but instead argued that an exception to the exclusion also applied, thus resulting in coverage. The court of appeals reversed and rendered judgment for Underwriters, finding that the exclusion applied and the exception did not. *Id*. In its petition for review in this Court, Gilbert argued both that the exclusion did not apply and, if it did, the exception to the exclusion applied as well. Pet. for Review at ix, *Gilbert Tex. Constr.*, 327 S.W.3d 118 (No. 08-0246), 2008 WL 2195918, at *6, *12. Underwriters then asserted that Gilbert had waived its argument that the exclusion did not apply

by failing to raise it in the court of appeals, but we disagreed. *Gilbert Tex. Constr.*, 327 S.W.3d at 125. "While ordinarily a party waives a complaint not raised in the court of appeals," we explained, "a complaint arising from the court of appeals' judgment may be raised either in a motion for rehearing in that court or in a petition for review in this Court." *Id.* (citing TEX. R. APP. P. 53.2(f); *Bunton*, 153 S.W.3d at 53).[13]

Here, when Sapphire argued for the first time in the court of appeals that the contractual deadline is an independent bar to G.T. Leach's arbitration demand, G.T. Leach neither conceded nor disputed that the court of appeals could decide that issue, and instead argued only that the bar did not apply. After the court of appeals held, for the first time in this case, that the bar applied and precluded arbitration regardless of whether G.T. Leach waived any right to arbitration, G.T. Leach asserted in its petition for review in this Court both that the court could not decide that issue and, if it could, the bar does not apply. Because the error of which G.T. Leach complains did not originate in the trial court and first arose from the court of appeals' judgment, G.T. Leach did not waive its complaint by raising it for the first time in its petition for review in this Court.

---

[13] We appear to have once held to the contrary in *In re K.A.F.*, 160 S.W.3d 923 (Tex. 2005), in which we stated that, although petitioner's "constitutional complaints relate to her appeal and therefore could not have been asserted in the trial court, she was required to raise them in the court of appeals in order to preserve error." *Id.* at 928 (holding that petitioner "waived these arguments by failing to raise them in the court of appeals"). In support of these statements, however, we cited two cases in which we had addressed only the well-established rule that a party must preserve error by asserting its complaints *in the trial court*. *Id.* at 928 (citing *In re B.L.D.*, 113 S.W.3d at 350–51 (citing cases for the proposition that objections and errors "must be preserved in the trial court"); *Tex. Dep't of Protective & Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001) (refusing to consider constitutional arguments that petitioner did not assert in the trial court). We cited no rule or authority in *K.A.F.* to support the proposition that a petitioner waives an argument by failing to raise it in the court of appeals when the petitioner's complaint first arises from that court's judgment. Consistent with our holdings in *Bunton* and *Gilbert*, as well as our holding today, our statement in *K.A.F.* should be read to mean that we *may* treat such an argument as waived, as we did in that case, but we are not *required* to do so.

That is not to say that we *must* address and resolve an argument that the petitioner failed to raise in the court of appeals whenever the asserted error arose from that court's judgment. In the exercise of its discretionary jurisdiction, a court may elect to address the issue, or not. *See, e.g.*, *United States v. Williams*, 504 U.S. 36, 41, 44–45 (1992) (finding it "a permissible exercise of our discretion" to address an issue that was not "pressed or passed upon" in the appellate court in the case presently before the Court). The decision involves "[i]mportant prudential considerations," such as the need to conserve judicial resources, whether allowing lower courts to first consider and rule on the issue will "further the goal of accuracy in judicial decision-making," and our duty to "promote fairness among litigants." *In re B.L.D.*, 113 S.W.3d at 350. We conclude that G.T. Leach did not waive its right to argue that the arbitrators, rather than the courts, must decide the effect of the contractual-deadline issues, and we elect to exercise our discretionary jurisdiction to resolve that argument now.

## 2. Arbitrability of the Deadline

We now turn to the question of who should decide whether the contractual deadline bars G.T. Leach's demand for arbitration in this case. Ultimately, this is a question of the parties' intent as expressed in their written agreement. When parties have contractually agreed to arbitrate their future disputes, the courts' obligation to honor and enforce that agreement requires that they refer those disputes to arbitration. The Texas Arbitration Act (TAA)[14] thus provides that courts "*shall* order the parties to arbitrate on application of a party showing: (1) an agreement to arbitrate; and

---

[14] The general contract provides for arbitration under the TAA, and each of the defendants sought to compel arbitration under that Act. While the Federal Arbitration Act (FAA) might also apply, no party argues that the FAA preempts the TAA on any issue in this case, or that the TAA and FAA materially differ on any such issue. We therefore presume that the TAA governs, but we may find guidance in court decisions addressing both acts. *Cf. Elis v. Schlimmer*, 337 S.W.3d 860, 862 (Tex. 2011) (observing that FAA preempts TAA "only when it or other state law would not allow enforcement of an arbitration agreement that the FAA would enforce" and that party seeking to avoid application of TAA has burden of raising that issue).

18

(2) the opposing party's refusal to arbitrate." TEX. CIV. PRAC. & REM. CODE § 171.021(a) (emphasis added); *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 753–54 (Tex. 2001) ("Once the trial court concludes that the arbitration agreement encompasses the claims, and that the party opposing arbitration has failed to prove its defenses, the trial court has no discretion but to compel arbitration and stay its own proceedings.")

The courts' role, then, is first to decide whether the parties made a valid and presently enforceable agreement to arbitrate. TEX. CIV. PRAC. & REM. CODE § 171.021(b) ("If a party opposing an application [for arbitration] denies the existence of the agreement, the court shall summarily determine that issue."). If they did, then the court must decide whether the present disputes fall within the scope of that agreement. *See id.*; *In re Hous. Pipe Line Co.*, 311 S.W.3d 449, 451 (Tex. 2009); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003). These questions that courts must resolve are sometimes referred to as questions of "arbitrability." *See, e.g.*, *Hous. Pipe Line*, 311 S.W.3d at 451–52; *Perry Homes*, 258 S.W.3d at 587–92.[15] If, by answering these questions, the court determines that the present disputes are in fact arbitrable under the parties' agreement, the court must complete its role by ordering the parties to arbitration and leaving it to the arbitrators to resolve those disputes. *See* TEX. CIV. PRAC. & REM. CODE § 171.021; *Venture Cotton Co-op. v. Freeman*, 435 S.W.3d 222, 232 (Tex. 2014).

We have also recognized that the question of whether a party has waived its right to arbitration through its litigation conduct is a question of arbitrability for the courts to decide. *Perry Homes*, 258 S.W.3d at 588. We concluded that this is a question of arbitrability, rather than a question to be arbitrated, because (1) "[c]ontracting parties would expect the court to decide

---

[15] In deciding these questions of arbitrability, courts apply the common principles of general contract law to determine the parties' intent. *In re Poly-Am., L.P.*, 262 S.W.3d 337, 348 (Tex. 2008).

whether one party's conduct before the court waived the right to arbitrate," (2) it is a "gateway" matter regarding "whether the parties have submitted a particular dispute to arbitration," and (3) "courts decide defenses relating solely to the arbitration clause." *Id.* at 588–89. In essence, the question of whether a party has waived its right to arbitration by its conduct in litigation is just another way of asking the first question of arbitrability: whether there is a presently enforceable arbitration agreement. If a party's conduct in litigation equates to a waiver of its rights under the arbitration agreement, there is no presently enforceable agreement to arbitrate.

In this regard, the United States Supreme Court has recognized a distinction between questions of "substantive arbitrability"—which courts decide—and "procedural arbitrability"— which courts must refer to the arbitrators to decide. *See BG Group, PLC v. Republic of Arg.*, 134 S. Ct. 1198, 1206–07 (2014); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 81 (2002). In *Howsam*, a brokerage firm argued that its client could not initiate an arbitration because the client failed to do so within a six-year deadline that the parties had contractually adopted as part of their arbitration agreement. 537 U.S. at 81. The Court held that this was not a question of arbitrability for the courts to decide. *Id.* at 83. Although the Court acknowledged that, "[l]inguistically speaking, one might call any potentially dispositive gateway question a 'question of arbitrability,'" it explained that "the phrase 'question of arbitrability' has a far more limited scope" and does not encompass "'procedural' questions which grow out of the dispute and bear on its final disposition" or "allegation[s] of waiver, delay, or a like defense." *Id.* at 84 (citation omitted). Quoting the Revised Uniform Arbitration Act of 2000, the Court explained that, "in the absence of an agreement to the contrary, issues of substantive arbitrability . . . are for a court to decide and issues of procedural arbitrability, *i.e.*, whether prerequisites such as time limits, notice, laches, estoppel,

20

and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide." *Id.* at 81 (emphasis and citation omitted, ellipsis in *Howsam*).

The Supreme Court reiterated this distinction in *BG Group*, further clarifying the difference between substantive arbitrability questions addressing the existence, enforceability, and scope of an agreement to arbitrate (which courts decide), and procedural arbitrability questions addressing the construction and application of limits on that agreement (which only arbitrators can decide):

> On the one hand, courts presume that the parties intend courts, not arbitrators, to decide what we have called disputes about "arbitrability." These include questions such as "whether the parties are bound by a given arbitration clause," or "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy."

> On the other hand, courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration. These procedural matters include claims of "waiver, delay, or a like defense to arbitrability." And they include the satisfaction of "prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate."

134 S. Ct. at 1206–07 (citations omitted).

We applied these distinctions when we decided in *Perry Homes* that waiver by litigation conduct presents a question of substantive arbitrability that courts must decide. 258 S.W.3d at 588–89. We held that, although *Howsam* referenced "waiver" and "delay" as "procedural matters" for arbitrators to decide, it did not mean that the issue of waiver *by litigation conduct* was one for arbitrators, rather than courts. *Id.* Instead, we held that courts should defer to arbitrators to resolve the issue of waiver when "waiver concerns limitations periods or waiver of particular claims or defenses," but courts should decide issues of waiver by litigation conduct. *Id.* at 588. We stated that "parties generally intend arbitrators to decide matters that 'grow out of the dispute and bear on its final disposition,'" such as "waiver of a substantive claim or delay beyond a limitations deadline." *Id.* at 589. Our explanation in *Perry Homes* is consistent with our prior recognition that,

21

once the party seeking arbitration proves the existence of an enforceable agreement to arbitrate, Texas and federal law recognize a strong presumption "in favor of arbitration such that myriad doubts—as to waiver, scope, and other issues not relating to enforceability—must be resolved in favor of arbitration." *Poly-Am.*, 262 S.W.3d at 348.[16]

In this case, the contractual deadline in the general contract falls squarely within the category of "matters that 'grow out of the dispute and bear on [the arbitrators'] final disposition" of the claims. *See Perry Homes*, 258 S.W.3d at 588. The deadline does not determine the present existence, enforceability, or scope of the agreement to arbitrate the parties' disputes, but instead imposes a procedural limit on the parties' rights under that agreement. It bears on the arbitrators' final disposition of Sapphire's claims—specifically, whether the arbitrators can award Sapphire a remedy on its negligence claims in light of Sapphire's more than two-year delay in asserting them. More pointedly, it involves an alleged "delay beyond a limitations deadline." *Perry Homes*, 258 S.W.3d at 589; *see also id.* at 588 (noting that "federal courts . . . consistently [defer to arbitrators] when waiver concerns limitations periods"). We explained in *Perry Homes* that, absent express contractual agreement to the contrary, issues of this nature must be resolved by arbitrators rather than courts. *See id.* at 588–89; *see also BG Grp.*, 134 S. Ct. at 1207 (observing that "satisfaction of 'prerequisites such as time limits'" are questions of procedural arbitrability for the arbitrator to decide).

Stated another way, the parties' dispute over the meaning and effect of the contractual deadline does not touch upon the issue of whether an enforceable agreement to arbitrate Sapphire's

---

[16] The Court in *Poly-America* referenced a "strong federal presumption" in favor of arbitration because the contracts in that case provided for arbitration under the FAA. *Poly-Am.*, 262 S.W.3d at 348. But the Court has observed in other cases that Texas law also strongly favors arbitration of disputes and recognizes a presumption in favor of arbitrability. *See, e.g.*, *Prudential Secs. Inc. v. Marshall*, 909 S.W.2d 896, 898–99 (Tex. 1995).

claims exists. Neither party disputes that such an agreement does exist. Instead, they dispute whether, in light of the contractual deadline, the existing, enforceable agreement limits G.T. Leach's rights under the agreement itself. Sapphire's contention that it does and G.T. Leach's contention that it does not are themselves "Claim[s] arising out of or related to the Contract," which the parties expressly agreed to arbitrate.[17] *See In re Wood*, 140 S.W.3d 367, 369 (Tex. 2004) (holding that dispute over whether contract prohibited class arbitration was a contract construction issue, which was a "dispute arising out of" the contract that the parties had committed to the arbitrator) (citing *Green Tree Fin. Co. v. Bazzle*, 539 U.S. 444 (2003), for the proposition that whether contract prohibited class arbitration was a "dispute about what the arbitration contract [meant,]" which was "a dispute 'relating to this contract'" that the parties had agreed "an arbitrator, not a judge, would answer").

We do not hold that disputes over a contractual deadline in an arbitration agreement will always present questions of procedural arbitrability that arbitrators must decide. If a party contends, for example, that a contractual deadline renders the agreement to arbitrate unconscionable or that the deadline operates to limit the scope of the claims the parties agreed to arbitrate, those contentions might raise issues of substantive arbitrability for the courts to decide. *Cf. Quilloin v. Tenet HealthSystem Phila., Inc.*, 673 F.3d 221, 234 (3d Cir. 2012) (considering argument that time limit in arbitration agreement was substantively unconscionable); *but see Kristian v. Comcast Corp.*, 446 F.3d 25, 43–44 (1st Cir. 2006) (holding that arbitrator should

---

[17] The general contract defines a "Claim" as

a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between [Sapphire] and [G.T. Leach] arising out of or relating to the Contract.

decide whether contract's one-year limitations provision conflicted with Clayton Act's four-year statute of limitations for antitrust claims). But Sapphire asserts no such contentions in this case. Instead, it concedes the existence of an enforceable arbitration agreement that applies to its claims against G.T. Leach, and argues only that the terms of that agreement limit G.T. Leach's rights under the agreement itself. Consistent with the decisions of numerous federal courts,[18] we conclude that Sapphire's argument presents questions of procedural arbitrability that only the arbitrators can decide, and the court of appeals thus erred by deciding the issue.

In summary, with respect to Sapphire's claims against G.T. Leach, we hold that G.T. Leach did not expressly or impliedly waive its right to arbitration, and the courts must defer to the arbitrators to decide whether and how the contractual deadline affects that right. We therefore reverse the court of appeals' judgment with respect to the trial court's denial of G.T. Leach's motion to compel arbitration.

---

[18] *See, e.g.*, *United Steel Workers of Am., AFL-CIO-CLC v. Saint Gobain Ceramics & Plastics, Inc.*, 505 F.3d 417, 418 (6th Cir. 2007) (holding that application of contractual time limit was issue for arbitrators rather than courts); *Marie v. Allied Home Mortg. Corp.*, 402 F.3d 1, 11 (1st Cir. 2005) (holding that trial court erred in interpreting and applying contractual requirement that "[a]rbitration under this section must be initiated within sixty days" of event giving rise to the claim because that issue was for arbitrators to decide); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120–21 (2d Cir. 1991) ("Although *Conticommodity* [*Services Inc. v. Philipp & Lion*, 613 F.2d 1222, 1224–25 (2d Cir. 1980)] involved a one-year time limitation set forth in the arbitration agreement itself, we stated emphatically that *any* limitations defense—whether stemming from the arbitration agreement, arbitration association rule, or state statute—is an issue to be addressed by the arbitrators."); *Nursing Home & Hosp. Union No. 434 AFL-CIO-LDIU by Mackson v. Sky Vue Terrace, Inc.*, 759 F.2d 1094, 1097 (3d Cir. 1985) (rejecting argument that grievances were "not subject to the arbitration process because [the other party] did not comply with the specific time limits for filing grievances under the agreement" and stating that "[e]ven assuming [that] argument has merit, the law is clear that matters of procedural arbitrability, such as time limits, are to be left for the arbitrator once the court determines that the parties have agreed in the contract to submit the subject-matter of the dispute to arbitration"); *see also McNamara v. Yellow Transp., Inc.*, 570 F.3d 950, 957 (8th Cir. 2009) (adopting reasoning of *Marie* in context of a party's argument that it was harmed by other party's delay in seeking arbitration because by that time party would be contractually barred from initiating arbitration, but directing trial court to retain jurisdiction on remand so that party opposing arbitration would not be left without a forum); *Glass v. Kidder Peabody & Co.*, 114 F.3d 446, 455 (4th Cir. 1997) ("Defenses of laches, mere delay, statute of limitations, and untimeliness constitute a broad category of waiver defenses that may be raised to defeat compelled arbitration. Laches, like its companion defenses, however, is a matter of 'procedural arbitrability' solely for the arbitrators' decision and not for the court.").

# III.
## The Other Defendants

We now turn to the arbitrability of Sapphire's claims against the Other Defendants, which include (1) the Insurance Brokers and Engineers, who each allegedly contracted directly with Sapphire in agreements that undisputedly did not include an enforceable arbitration agreement, and (2) the Subcontractors, who contracted directly with G.T. Leach in agreements that allegedly did include enforceable arbitration agreements. The Other Defendants contend that Sapphire agreed to arbitrate its claims against them in the general contract and the subcontracts, and alternatively, that Sapphire is equitably estopped from denying its assent to the arbitration agreements in those contracts. Although the Other Defendants did not sign the general contract and Sapphire did not sign the subcontracts, we have recognized that "sometimes a person who is not a party to the agreement can compel arbitration with one who is, and vice versa." *Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 305 (Tex. 2006). More specifically, "nonparties may be bound to an arbitration clause when the rules of law or equity would bind them to the contract generally." *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 129 (Tex. 2005)**.** We conclude here, however, that neither law nor equity requires Sapphire to arbitrate these claims.

## A.     Arbitration Under the General Contract

We begin with the Other Defendants' reliance on the general contract as support for their arbitration demands. We conclude that Sapphire did not agree in the general contract to arbitrate its claims against the Other Defendants and is not equitably estopped from refusing to do so.

### 1.     No Agreement to Arbitrate

As we have explained, a party seeking to compel arbitration must establish that a valid arbitration agreement exists and that the claims at issue fall within the scope of that agreement. TEX. CIV. PRAC. & REM. CODE § 171.021(a); *FirstMerit Bank*, 52 S.W.3d at 753. Sapphire

25

concedes that the general contract contains a valid arbitration agreement, but contends that the Other Defendants cannot enforce that agreement because they are not signatories or parties to the general contract. *See In re Rubiola*, 334 S.W.3d 220, 224 (Tex. 2011) (holding that, generally, "parties must sign arbitration agreements before being bound by them"). We have recognized, however, that in some circumstances a non-signatory can be bound to, or permitted to enforce, an arbitration agreement. *See, e.g.*, *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005) (listing "(1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel, and (6) third-party beneficiary").

With regard to the Other Defendants and the general contract, the question in this case, as in *Rubiola*, "is not whether a non-signatory may be compelled to arbitrate but rather whether a non-signatory may compel arbitration." 334 S.W.3d at 224. As a general rule, "an arbitration clause cannot be invoked by a non-party to the arbitration contract." *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 532 (5th Cir. 2000). "[The] policy favoring arbitration is strong, but it alone cannot authorize a non-party to invoke arbitration." *Id*. Thus, the Other Defendants must establish that they have a valid legal right to enforce the general contract's arbitration agreement even though they are not parties to that contract. The Other Defendants contend that Sapphire agreed in the general contract that the Other Defendants could enforce its arbitration provisions. *See Rubiola*, 334 S.W.3d at 222 (holding that "parties to an arbitration agreement may grant non-signatories the right to compel arbitration").[19]

---

[19] The agreement at issue in *Rubiola* gave the "parties" the right to demand arbitration and defined "parties" to include not only "each and all persons and entities signing this agreement," but also all "individual partners, affiliates, officers, directors, employees, agents, and/or representatives of any party to such documents, and . . . any other owner and holder of this agreement." *Rubiola*, 334 S.W.3d at 222–23. We agreed that it thus "expressly provides that certain non-signatories are to be parties to the agreement." *Id*. at 224.

This contention raises questions about "the existence of a valid arbitration clause between specific parties and is therefore a gateway matter for the court to decide." *Id*. at 224. Ultimately, the question requires us to determine "the intent of the parties, as expressed in the terms of the agreement," so we apply "ordinary principles of state contract law [to] determine whether there is a valid agreement to arbitrate." *Id*. (quoting *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 355, 358 (5th Cir.2003)); *see also Kellogg Brown & Root*, 166 S.W.3d at 738 (holding that, "[u]nder the FAA, ordinary principles of state contract law determine whether there is a valid agreement to arbitrate"). The Other Defendants argue that several provisions of the contract demonstrate Sapphire's intent to allow them to require arbitration, but we find none of them persuasive.

### a. The "Scope" of Arbitration

First, the Other Defendants contend that Sapphire's claims against them fall within the scope of the general contract's arbitration agreement because the scope includes "[a]ny Claim arising out of or related to the Contract," and Sapphire expressly agreed that the arbitration could include parties other than G.T. Leach. Specifically, the Other Defendants rely on a provision of the general contract in which Sapphire and G.T. Leach agreed that "[a]ny arbitration may include, by consolidation or joinder or any other manner, parties other than the Owner, Contractor, a Subcontractor, a separate contractor . . . and other persons substantially involved in a common question of fact or law whose presence is required if complete relief is to be accorded in arbitration."

The Other Defendants argue that, through this "joinder provision," Sapphire agreed that the scope of the arbitration would include Sapphire's claims against the Other Defendants because those claims "arise out of or relate to" the general contract, those claims and Sapphire's claims

27

against G.T. Leach involve common questions of law or fact, and the Other Defendants' presence is "required" for complete relief to be accorded in the arbitration. We conclude that the Other Defendants' reliance on the scope of the agreement between Sapphire and G.T. Leach to establish the existence and enforceability of an agreement between Sapphire and the Other Defendants is misplaced. As we have explained, a party seeking to compel arbitration must establish *both* (1) the existence of a valid enforceable agreement to arbitrate and (2) that the claims at issue fall within the scope of that agreement. TEX. CIV. PRAC. & REM. CODE § 171.021(a); *FirstMerit Bank*, 52 S.W.3d at 753. The Other Defendants' argument that Sapphire agreed that they, as non-signatories, could enforce the arbitration agreement addresses the first issue, not the second. Although Sapphire's claims may fall within the scope of the agreement, the scope of the arbitration clause "does not answer whether [Sapphire] must arbitrate" with the Other Defendants. *Kellogg Brown & Root*, 166 S.W.3d at 739–40.

### b. The Joinder Provisions

The Other Defendants contend that the joinder provision itself constitutes Sapphire's agreement that they could enforce the general contract's arbitration agreement. Specifically, they contend that, through the joinder provision, Sapphire agreed to allow non-parties to "require" arbitration if their presence is "required" for complete relief to be afforded in the arbitration. The Subcontractors, in particular, note that Sapphire and G.T. Leach specifically revised the AIA form to add a reference to "a Subcontractor" as a party whose presence would be expected in the arbitration. Because Sapphire seeks to recover the same damages from each of the defendants and to hold all of the defendants jointly and severally liable for those damages, they assert, the arbitration can only provide "complete relief" if all of them are parties to it. We do not agree.

28

To begin with, the joinder provision states that an arbitration "*may* include" other parties, and we find no basis on which to conclude that the parties intended the word "may" to be mandatory rather than permissive in this context. *Cf. Iliff v. Iliff*, 339 S.W.3d 74, 81 (Tex. 2011) (stating that the word "may" is "permissive" and "imports the exercise of discretion"); *Dall. Cnty. Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 874 (Tex. 2005) ("The words 'may' and 'shall' mean different things, and . . . [t]he context in this case does not require an interpretation of the permissive word 'may' to mean something other than its plain meaning."); *Wichita Cnty., Tex. v. Hart*, 917 S.W.2d 779, 782 (Tex. 1996) ("The Legislature's use of the permissive term 'may' in the Whistleblower Act's venue provision, in light of its contemporaneous reorganization of the venue statute, strongly suggests that the Act's venue provision is permissive."). The original AIA form provided that "[n]o arbitration shall include, . . . parties other than the Owner, Contractor, a separate Contractor, . . . and other persons substantially involved in a common question of fact or law whose presence is required if complete relief is to be accorded in arbitration." In its original form, the provision thus prohibited joinder of any but the listed parties (at least, absent written consent of all the parties), but it did not require joinder of the listed parties. Sapphire and G.T. Leach revised this provision to state that "*Any* [instead of "No"] arbitration *may* [instead of "shall"] include parties other than" the listed parties, and added "Subcontractors" to the list. The effect of their revisions was to remove the prohibition against including parties "other than" those listed. Because they changed "shall" to "may," they did not require the joinder of unlisted parties, but neither did they require the joinder of the listed parties. In fact, they retained a sentence from the original form providing that a party's "[c]onsent to arbitration involving an additional person or entity . . . shall not constitute consent to arbitration of a claim not described therein or with a person or entity not named or described therein."

29

The provision thus permits the parties to the general contract to consent to the joinder of additional parties in the arbitration, but it does not require them to do so. Ultimately, the Other Defendants concede as much by repeatedly acknowledging throughout their briefs that the joinder provision "allows inclusion or joinder," "allow[s] them to be joined" so that they "could participate" in the arbitration, and "permits all parties to arbitrate" together. Nevertheless, they contend that, because this clause is ambiguous as to whether it is mandatory or permissive, we must construe it as mandatory in support of the law's presumption in favor of arbitration. This presumption, however, requires that doubt "as to waiver, scope, and *other issues not relating to enforceability*—must be resolved in favor of arbitration." *Poly-Am.*, 262 S.W.3d at 348 (emphasis added). And, in any event, we do not find the language here to be ambiguous. The fact that the provision refers to other parties as those whose presence "is required" to accord complete relief does not make their joinder "required"; rather, it allows for their joinder, but only if their joinder is "required" to provide complete relief. We conclude that the joinder provision does not give the Other Defendants, who are not parties to the general contract, a legal right to require Sapphire to arbitrate with them.

The Other Defendants contend that, at a minimum, the joinder provision gives G.T. Leach a contractual right to join others whose presence is "necessary to completely resolve the dispute," even if it does not give those other parties the right to join themselves. In light of the provision's permissive language and references to the necessity of each party's "consent," as we have just discussed, we disagree. Moreover, even if the contract gave G.T. Leach such a right, G.T. Leach has not requested that relief in this Court. G.T. Leach asks this Court to "order the claims brought by Sapphire against [G.T. Leach] to arbitration," without reference to the claims brought by Sapphire against the Other Defendants.

### c.   The Definition of "Contractor"

The Engineers and Insurance Brokers point out that the general contract states that it is an agreement between "the Owner" and "the Contractor," and that Sapphire and G.T. Leach each signed the agreement in those respective capacities. They note, however, that the contract provides that the term "Contractor" includes any contractor who executes a separate agreement with the owner. Since Sapphire is suing them for breach of separate agreements directly between each of them and Sapphire, they contend that they are each a "Contractor" under the general contract and thus entitled to enforce its arbitration agreement.  The contract, however, expressly provides that the "Contract Documents shall not be construed to create a contractual relationship of any kind . . . between [Sapphire] and a Subcontractor . . . or [] between any persons or entities other than [Sapphire] and [G.T. Leach]."[20]

In summary, we find no language in the general contract that gives the Other Defendants rights to enforce the general contract's arbitration clause against Sapphire. We thus conclude that Sapphire did not agree in the general contract to arbitrate its claims against the Other Defendants.

---

[20] In addition, a supplemental provision of the general contract states that "[n]o person or entity shall be deemed to be a third party beneficiary of any provisions of the Contract, nor shall any provisions thereof be interpreted to create a right of action or otherwise permit anyone not a signatory party to the Contract to maintain an action for personal injury or property damage." While the Other Defendants contend that this provision was in an unsigned supplement to the general contract and, in any event, does not expressly prohibit demands for arbitration, they concede that the contract expressly incorporates these provisions as part of the "Contract Documents." In any event, this provision reflects Sapphire's intent that other parties not have rights under the general contract more clearly than any provision on which the Other Defendants rely reflects an intent that they have such rights. Even ignoring this provision, the lack of *any* provision by which *Sapphire* agrees to allow the Other Defendants to compel arbitration of Sapphire's claims against them defeats their attempts to do so.

## 2.     No Equitable Estoppel

As an alternative to the argument that Sapphire expressly agreed that they can enforce the general contract's arbitration provisions, the Other Defendants argue that Sapphire is equitably estopped from denying its assent to such an agreement. We do not agree.

We have recognized that, under principles of equitable estoppel, "a litigant who sues based on a contract subjects him or herself to the contract's terms . . . , including the Arbitration Addendum." *FirstMerit Bank*, 52 S.W.3d at 755–56; *see Meyer*, 211 S.W.3d at 305 (listing cases so holding). This is because the claimant cannot "have it both ways"; it cannot, "on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Meyer*, 211 S.W.3d at 306. This equitable principle applies when a claimant seeks "direct benefits" under the contract that contains the arbitration agreement. *Kellogg Brown & Root*, 166 S.W.3d at 739. "Whether a claim seeks a direct benefit from a contract containing an arbitration clause turns on the substance of the claim, not artful pleading." *Weekley Homes*, 180 S.W.3d at 131–32.

It is not enough, however, that the party's claim "relates to" the contract that contains the arbitration agreement. *Kellogg Brown & Root*, 166 S.W.3d at 741. Instead, the party must seek "to derive a direct benefit"—that is, a benefit that "stems directly"—from that contract. *Id.*; *In re Morgan Stanley & Co.*, 293 S.W.3d 182, 184 (Tex. 2009). The claim must "depend on the existence" of the contract, *Meyer*, 211 S.W.3d at 307, and be unable to "stand independently" without the contract, *Kellogg Brown & Root*, 166 S.W.3d at 739–40. The alleged liability must "arise[] solely from the contract or must be determined by reference to it." *Weekley Homes*, 180 S.W.3d at 132. But "when the substance of the claim arises from general obligations imposed by

32

state law, including statutes, torts and other common law duties, or federal law," rather than from the contract, "direct benefits" estoppel does not apply, even if the claim refers to or relates to the contract.[21] *Morgan Stanley*, 293 S.W.3d at 184 n.2; *see also Kellogg Brown & Root*, 166 S.W.3d at 740–41 (holding that subcontractor's quantum meruit claim against contractor did not justify direct benefits estoppel to compel arbitration under contract between contractor and owner).

The Other Contractors contend that Sapphire's claims against them seek a "direct benefit" under the general contract, even though they are not parties to that contract, because the claims "arise from and must be determined by reference to" the general contract. More specifically, they assert that the work that they performed was necessary only because of the general contract, and without the general contract they would have had no duties of their own to perform. Sapphire's claims thus "relate to and arise out of" the general contract, they contend, because they are claims for work performed "pursuant to" the general contract. The Subcontractors also note that the general contract required G.T. Leach to "include terms in the subcontracts . . . binding its subcontractors . . . to the applicable terms of this agreement."

Sapphire is not suing the Other Defendants, however, for breach of obligations under the general contract. Rather, Sapphire alleges in its petition that the Other Defendants each breached duties that they each "contractually agreed" to perform, and failed to perform them as a reasonable professional would have performed them. We agree that Sapphire is not seeking direct benefits

---

[21] Even if "direct benefits" estoppel does not apply based on the claims in the lawsuit, we have recognized that "a nonparty may seek or obtain direct benefits from a contract by means other than a lawsuit" and that application of the doctrine may be based on "conduct during the performance of the contract" rather than conduct during the lawsuit. *See Weekley Homes*, 180 S.W.3d at 132–33, 135 (holding that "when a nonparty consistently and knowingly insists that others treat it as a party, it cannot later 'turn[] its back on the portions of the contract, such as an arbitration clause, that it finds distasteful'") (citations omitted). The parties do not advance this theory here.

under the general contract. We read Sapphire's allegations to refer to separate agreements in which the Engineers agreed with Sapphire to provide engineering services, the Insurance Brokers agreed with Sapphire to provide insurance services, and the Subcontractors agreed with G.T. Leach to provide construction-related services.[22]

The record and briefs in this case reflect that Sapphire contends that the Engineers and Insurance Brokers contracted directly with Sapphire and are what the general contract refers to as a "separate contractor" rather than a "subcontractor." Thus, although Sapphire's breach of contract claims against the Engineers may "relate to" the general contract, they "arise out of" and directly seek the benefits of a separate alleged agreement between Sapphire and the Engineers. Similarly, Sapphire alleges that the Insurance Brokers "contracted with Sapphire to procure adequate insurance to protect Sapphire while the Sapphire condominiums were being built" and "breached that agreement thereby damaging Sapphire." These claims depend on an alleged insurance-procurement agreement between Sapphire and the Insurance Brokers, not the general contract between Sapphire and G.T. Leach.

And finally, Sapphire asserts that the Subcontractors breached obligations they accepted in their subcontracts with G.T. Leach, not in the general contract to which Sapphire was a party. While these claims may bear some relationship to the general contract, the fact that the claims would not have arisen but for the existence of the general contract is not enough to establish equitable estoppel. *See Kellogg Brown & Root*, 166 S.W.3d at 739–40. Sapphire's contract claims

---

[22] The Other Defendants point out that Sapphire's experts filed reports in the trial court in which they relied in part on the general contract's specification and notes to establish the standards for the Other Defendants' contractual performance. These reports, however, do not suggest that the general contract imposed the duty to meet these specifications. Instead, it appears that Sapphire contends that the Other Defendants' separate contractual agreements included promises to comply with these specifications.

against the Other Defendants do not, on their face, seek a "direct benefit" under the general contract; rather, the record at this stage indicates that they seek direct benefits under other alleged contracts. Under these circumstances, we cannot conclude that the "direct benefits" theory of equitable estoppel authorizes the Other Defendants to rely on the arbitration provision in Sapphire's general contract with G.T. Leach. *See Morgan Stanley*, 293 S.W.3d at 184; *Weekley Homes*, 180 S.W.3d at 133; *Kellogg Brown & Root*, 166 S.W.3d at 739–40.

In addition, the Other Defendants argue that, even if Sapphire is not suing them for breach of the general contract, it is seeking to hold them jointly and severally liable for the damages that Sapphire alleges G.T. Leach's breach of that contract caused. Specifically, the Insurance Brokers contend that, "if Sapphire seeks to hold the Insurance Defendants liable for damages arising from G.T. Leach's alleged breach of the [general contract], then Sapphire must necessarily rely on the existence of the [general contract]."[23] But contrary to the Insurance Brokers' argument, Sapphire's pleadings do not assert that the Insurance Brokers are jointly and severally liable for the damages allegedly resulting from G.T. Leach's breach of contract,[24] and the parties have not identified any

---

[23] Alternatively, the Insurance Brokers argue that

if Sapphire seeks to hold [them] jointly and severally liable for damages with respect to Sapphire's tort claims against [G.T. Leach], then Sapphire must necessarily rely on allegations of interdependent and concerted misconduct between those parties. Either way, Sapphire satisfies one or both bases for imposing equitable estoppel under this Court's decision in *Meyer* and thus must be compelled to arbitrate its claims against the Insurance Defendants.

But we declined to adopt the "concerted misconduct" theory of equitable estoppel in *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 191–92 (Tex. 2007). The Insurance Brokers do not address *Merrill Lynch* or raise any argument that this case is distinguishable in any manner material to our analysis of the "concerted misconduct" theory in that case. We therefore decline to reconsider that decision here.

[24] In fact, Sapphire's fourth amended petition does not reference "joint and several liability" at all. The Other Defendants quote Sapphire's counsel as having orally argued to the trial court that the defendants are jointly and severally liable for all damages, but we must look to the pleadings to determine the nature of Sapphire's claims.

doctrine that would permit Sapphire to hold them jointly and severally liable under the facts of this case.[25] "Texas law permits joint and several liability for most actions based in tort, as long as 'the percentage of responsibility attributed to the defendant with respect to a cause of action is greater than 50 percent.'" *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 424 (Tex. 2011) (quoting TEX. CIV. PRAC. & REM. CODE § 33.013(b)(1)). But the Insurance Brokers' "direct benefits" estoppel argument is premised on Sapphire seeking to hold them jointly and severally liable for G.T. Leach's breach of contract, not its torts.

Finally, the Other Defendants argue that Sapphire is equitably estopped from refusing to arbitrate its tort claims against them because those claims assert only negligent performance of contractual duties, and thus seek only damages resulting from the breach of contractual duties rather than duties imposed by law. Under these circumstances, they contend, the allegedly negligent breaches can "only be characterized as a breach of contract," and the claims thus "sound in contract, not tort." This argument raises a complex legal doctrine: the "economic loss" rule, sometimes referred to in this context as the law of "contorts." *See, e.g.*, *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494–95 (Tex. 1991); *id.* at 495 (Gonzales, J., concurring). We need not address this doctrine here, however, because even if Sapphire's tort claims sound in contract, they do no arise solely out of or otherwise seek direct benefits under the general contract. *See Kellogg Brown & Root*, 166 S.W.3d at 740–41. While they have some relationship to the general

---

[25] *Cf. S. Union Co. v. City of Edinburg*, 129 S.W.3d 74, 87 (Tex. 2003) (noting that Texas law has recognized specific legal theories under which corporate structure can be disregarded to hold corporate actors jointly and severally liable for corporation's contractual obligations); TEX. BUS. ORGS. CODE § 152.304(a) (imposing joint and several liability on partners for "all" partnership obligations); TEX. GOV'T CODE § 60.152(b)(1) (authorizing contractual assumption of joint and several liability in certain government contracts); TEX. LAB. CODE § 407A.056 (requiring contractual assumption of joint and several liability for group and employer under certain group self-insurance agreements); TEX. NAT. RES. CODE § 161.323 (imposing joint and several liability on "veteran purchaser" and subsequent assignees of veteran with respect to certain land contracts under some circumstances).

contract, the mere fact that the claims would not have arisen but for that contract is not enough to establish equitable estoppel. *See id.* at 739–40. We therefore hold that equitable estoppel does not apply to enable the Other Defendants to compel Sapphire to arbitrate its tort claims against them under the general contract.

**B.      Arbitration Under the Subcontracts**

Finally, we turn to the Subcontractors' arguments that Sapphire agreed through the subcontracts to arbitrate its claims against the Subcontractors, or alternatively, that Sapphire is equitably estopped from denying its assent to the arbitration agreement in the subcontracts. While we note that Sapphire is not a signatory to the subcontracts, its claims that the Subcontractors "contractually agreed" to perform their services and are liable to Sapphire for having breached those agreements at least appear to be "based on" and "directly seek benefits" under the subcontracts, and thus Sapphire may be equitably estopped to deny obligations under the subcontracts. *See FirstMerit Bank*, 52 S.W.3d at 755–56. We need not decide that issue, however, because we conclude that, even if the subcontracts are binding on Sapphire, they do not require the parties to arbitrate these claims.

The Subcontractors provided their respective services pursuant to essentially identical subcontracts that they entered into with G.T. Leach. Both of these subcontracts contain three sections that pertain to the arbitration of disputes between the parties. First, section 11.1 states the parties' agreement to arbitrate disputes:

> All claims, disputes and other matters in question arising out of, or relating to, this Subcontract or the breach thereof shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association unless the parties mutually agree otherwise.

Section 11.3 then states that, if G.T. Leach "enter[s] into arbitration with [Sapphire] or others regarding matters relating to this Subcontract, Subcontractor will agree, if requested by [G.T.

Leach] to consolidation of this arbitration with [G.T. Leach's] arbitration with [Sapphire]," and in that case the Subcontractors "shall be bound by the result of the arbitration with [Sapphire] to the same degree as [G.T. Leach]." Finally, however, section 12.13 states that the parties do *not* agree to mandatory arbitration:

> Notwithstanding any provision to the contrary contained in the Contract Documents, Subcontractor expressly agrees that this Subcontract does not contain a provision for the mandatory arbitration of disputes, nor does it incorporate by reference such a provision if such is contained in the [general] contract between [G.T. Leach] and [Sapphire].

The court of appeals held that the disclaimer in this section 12.13 "nullif[ies]" the arbitration agreement in section 11.1, and Sapphire relies on that holding here.

The Subcontractors contend that section 12.13's disclaimer does not nullify the agreement in section 11.1 because (1) the agreement appears earlier within the contract, and "terms stated earlier in an agreement must be favored over subsequent terms" in that same agreement, *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); (2) the agreement is more specific than the disclaimer, and specific provisions control over general provisions, *see Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994); (3) we must consider and give effect to all of the provisions with reference to the whole instrument, *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962); and (4) we must construe the provisions together if we can, rather than allow one to cancel the other, *In re U.S. Home Corp.*, 236 S.W.3d 761, 765 (Tex. 2007).

We conclude that there is no way to give full effect to both provisions, and that one must necessarily "nullify" the other at least to some extent. If we give effect to the agreement to arbitrate in section 11.1, for example, then we must necessarily conclude that the agreement does "contain a provision for the mandatory arbitration of disputes," and thus nullify section 12.13's disclaimer. The Subcontractors argue that we can give effect to both by construing the disclaimer to mean that arbitration is "mandatory" unless all parties mutually agree not to arbitrate, in which case

38

arbitration would not be mandatory. But parties can always mutually agree not to do what they previously agreed to do, and in any event, section 11.1 already provides that the parties can "mutually agree" not to arbitrate.

Generally, we must give the subcontracts their plain meaning and enforce them without rendering either provision entirely superfluous. *Cf. El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 808 (Tex. 2012) (prohibiting such a result); *see also Moayedi*, 438 S.W.3d at 7; *Mercer v. Hardy*, 444 S.W.2d 593, 595 (Tex. 1969). But we cannot do that when the plain meaning of one provision unambiguously requires that we not enforce another. *See Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 637 (Tex. 2010). There is a direct conflict between section 11.1's provision that all disputes "shall be decided by arbitration" and section 12.13's provision that "this Subcontract does not contain a provision for the mandatory arbitration of disputes." And if that were all that the two provisions provided, an ambiguity might exist that requires us to rely on canons of construction to determine the parties' intent.

But section 12.13 explicitly states that the Subcontract does not require mandatory arbitration "[n]otwithstanding any provision to the contrary" in any of the contract documents. *Cf. In re Lee*, 411 S.W.3d 445, 454 (Tex. 2013) ("The use of the word 'notwithstanding' indicates that the Legislature intended section 153.0071 to be controlling."). Like the statute at issue in *DeQueen*, which expressly provided that any conflicting "rule of law, statute, or regulation . . . is ineffective," the language of section 12.13 "specifically provide[s] the means for resolving conflicts" by providing that, in the event of any conflict, section 12.13 prevails. *DeQueen*, 325 S.W.3d at 632, 637. There is thus no ambiguity, and we need not rely on canons of construction like the rules that earlier or more specific provisions prevail. *Id*. Although these canons provide useful tools for resolving conflicting provisions, there is no conflict to resolve here because the plain language of

39

section 12.13 resolves the conflict. *Id*. at 638. We therefore conclude that, even if Sapphire is equitably estopped from denying its assent to the agreements contained in the subcontracts, those agreements do not include a valid, enforceable agreement to arbitrate its claims against the Subcontractors. The court of appeals, therefore, did not err in affirming the trial court's denial of the Subcontractors' motions to compel arbitration.

We therefore affirm the court of appeals with respect to the trial court's denial of the Insurance Brokers', Engineers', and Subcontractors' motions to compel arbitration.

**IV.**
**Conclusion**

We affirm in part and reverse in part. We affirm the portion of the court of appeals' judgment affirming the trial court's denial of the Engineers', Insurance Brokers', and Subcontractors' motions to compel arbitration of Sapphire's claims against them, and we reverse the portion of the court of appeals' judgment affirming the trial court's denial of G.T. Leach's motion to compel arbitration of Sapphire's claims against it. We remand this case to the trial court for further proceedings consistent with this opinion.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: March 20, 2015.

40