**DISSENT and Opinion Filed April 23, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00462-CV

### SIG-TX ASSETS, LLC D/B/A LINCOLN FUNERAL HOME, Appellant
### V.
### BEATRICE SERRATO, INDIVIDUALLY, BEATRICE SERRATO, AS MOTHER AND NEXT FRIEND OF M.S., A MINOR CHILD, PHILLIP SERRATO, AND SYLVIA RAMIREZ, Appellees

**On Appeal from the 95th District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-17-17209**

## DISSENTING OPINION
Dissenting Opinion by Justice Bridges

I respectfully dissent from the majority's opinion and judgment because I would conclude the trial court abused its discretion in denying the motion to compel arbitration filed by SIG-TX Assets, LLC d/b/a Lincoln Funeral Home.

As the majority correctly sets out, the record contains the affidavit of SIG-TX's funeral director, Christopher Jones. The affidavit stated Jones received a call from Beatrice Serrato on December 14, 2015, shortly after 5:00 p.m. Beatrice stated she was the daughter-in-law of Maria C. Serrato, Beatrice was Maria's guardian, and Beatrice had power of attorney for Maria. Beatrice also stated Maria's death was imminent and inquired how much was owed on Maria's prearrangement contract with SIG-TX. The next day, Beatrice again contacted SIG-TX and said Maria had died that day.

On the morning of December 16, 2015, Jones met with Beatrice, Juana Serrato, Ana Serrato, and two of Maria's grandsons at Lincoln Funeral Home to make arrangements for Maria's funeral. Beatrice informed Jones that she was "the person in charge" of the disposition of Maria's remains. During the meeting, Beatrice "spoke on behalf of the family and was the primary decision maker," and Jones filled out a worksheet identifying Beatrice as "PERSON(S) IN CHARGE" and detailing the death certificates needed, the program order, the flowers, and the casket style. Beatrice also provided information for the funeral and information contained in an "Arrangement Worksheet" so that, among other things, a death certificate could be prepared. The arrangement worksheet also identified the surviving family; specified where the funeral notice would appear; set the time, date, and place for the funeral and visitation; provided the family would provide clergy and pallbearers; and gave instructions for preparing Maria's body for viewing.

Also at the December 16 meeting, Jones provided Beatrice and Juana Serrato, Maria's daughter-in-law, copies of the funeral contract and cemetery contract. Both contracts contained arbitration clauses. Jones' affidavit stated he went over the contracts with Beatrice, Juana, and Ana Serrato, and all three said they understood the contracts. Beatrice said that Juana would be signing the contracts because Juana, not Beatrice, was next-of-kin.

The record also contains Beatrice's affidavit in which she stated she assisted her family in "the handling of Maria's personal matters and her funeral at her death." Beatrice called the funeral home on December 15, 2015, to let them know Maria had passed away. On December 16, 2015, Beatrice and her son accompanied Juana, Maria's daughter, and Maria's grandson to a meeting with the funeral home. Beatrice stated Juana signed the contracts at the funeral home because "she was the person who accompanied Maria in 2008 in the original meeting with the funeral home for and on behalf of Maria." According to Beatrice, Juana was "the only person who read and signed

the contract." Beatrice stated she did not make any payments to the funeral home and did not negotiate or change any terms of the agreement between Maria and the funeral home.

On December 18, 2015, Beatrice met again with the funeral home for a private viewing of Maria "to view the results of the embalming process and see the condition of her hair, clothing, and jewelry." Also present were Beatrice's son, Beatrice's daughter, and Sylvia Ramirez, Maria's daughter. When the family realized the body was not Maria's, Beatrice questioned the identity of the body and "was forced to argue with the funeral representative," trying to prove that the body was not Maria's. The representative said "the embalming process sometimes changes the appearance" and insisted the body was Maria's. The representative checked the identification tag but did not tell Beatrice or the family what it said at the time. At some point after the December 18 meeting, Beatrice was told by the funeral home representative that the body Beatrice and her family had viewed was not Maria's. The representative said "Maria had been buried in a funeral service of another family on the afternoon of December 18, 2015."

Beatrice stated she met one more time with the funeral home to "discuss how [Maria's] body was to be exhumed and reburied in a funeral before our family." At the meeting, Beatrice and her family expressed their "emotional concern with our loved one's body being placed in a casket that another dead body had already been in." The funeral home "then advised that they would change the casket and asked [Beatrice] to pick out a new one." Beatrice "picked out a new one after the funeral home asked [her] to do so, in order to ensure that my mother-in-law's body would not be placed in the casket of another." Maria was buried on December 21, 2015.

In *In re Weekley Homes*, 180 S.W.3d 127, 129 (Tex. 2005) (orig. proceeding), the Texas Supreme Court addressed the issue whether Weekley, a party to a Purchase Agreement containing an arbitration clause, could compel arbitration of a personal injury claim brought by Patricia Von Bargen, a nonparty. The case arose out of a contract for construction of a 4000-square-foot home

between Weekley and Vernon Forsting, Von Bargen's father. *See id.* Forsting's intent in purchasing such a large home was to live with Von Bargen and her husband and three sons. *Id.* Von Bargen and her husband negotiated directly with Weekley on many issues before and after construction—paying a $1000 deposit, selecting the floor plan, signing a letter of intent as "purchasers," and making custom design choices. *Id.* Numerous problems arose with the home after completion. *Id.* When the family moved out of the house briefly so Weekley could make repairs, it was Von Bargen who requested and received reimbursement. *Id.* Indeed, Von Bargen admitted handling "almost . . . all matters related to the house, the problems and the warranty work and even the negotiations." *Id.* Unsatisfied, Von Bargen filed suit against Weekley and asserted only personal injury claims, alleging Weekley's negligent repairs caused her to develop asthma. *Id.* Weekley moved to compel arbitration of all claims under the Federal Arbitration Act. *Id.* at 129–30.

The court in *Weekley* stated Von Bargen purported to make no claim on the Weekley contract, claiming only that she developed asthma from dust created by Weekley's repairs of the home. *Id.* at 132. While Weekley's duty to perform those repairs arose from the Purchase Agreement, the court noted, a contractor performing repairs has an independent duty under Texas tort law not to injure bystanders by its activities or by premises conditions it leaves behind. *Id.* The court observed there was nothing in the record to suggest Von Bargen's claim was different from what any bystander might assert or what she might assert if the contractor were not Weekley. *Id.* However, the court reasoned, a nonparty may seek or obtain direct benefits from a contract by means other than a lawsuit. *Id.* In some cases, a nonparty may be compelled to arbitrate if it deliberately seeks and obtains substantial benefits from the contract itself. *Id.* The analysis here focuses on the nonparty's conduct during the performance of the contract. *Id.* at 132–33.

Applying these principles to Von Bargen's claims, the court observed Von Bargen had not merely resided in the home. *Id.* at 133. Claiming the authority of the Purchase Agreement, Von Bargen directed how Weekley should construct many of its features, repeatedly demanded extensive repairs, personally requested and received financial reimbursement, and conducted settlement negotiations with Weekley. *Id.* Having obtained these substantial actions from Weekley by demanding compliance with provisions of the contract, the court reasoned, Von Bargen could not equitably object to the arbitration clause attached to them. *Id.* In other words, when a nonparty consistently and knowingly insists that others treat it as a party, it cannot later "turn[] its back on the portions of the contract, such as an arbitration clause, that it finds distasteful." *Id.* at 134 (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 (3d Cir. 2001)).

Here, as in *Weekley*, Beatrice and the other appellees were nonparties to the funeral and burial contracts containing arbitration clauses. However, Beatrice and the other appellees obtained substantial actions from SIG-TX by demanding compliance with provisions of the contracts: at a December 16, 2015 meeting, Beatrice identified herself to SIG-TX as the "person in charge" of the disposition of Maria's remains and worked with Jones to fill out a worksheet containing the details of Maria's funeral arrangements; on December 18, 2015, Beatrice and other members of the family met again at the funeral home for a private viewing of Maria "to view the results of the embalming process and see the condition of her hair, clothing, and jewelry," the details of which were specified in the Arrangement Worksheet; when the family realized the body was not Maria's, Beatrice was "forced to argue with the funeral representative"; SIG-TX was under a contractual duty to provide a viewing, funeral, interment, and perpetual care of Maria's body pursuant to the funeral and burial contracts; after the December 18, 2015 meeting, a SIG-TX representative admitted Maria "had been buried in a funeral service of another family"; at a final meeting,

Beatrice met with the funeral home to "discuss how [Maria's] body was to be exhumed and reburied in a funeral before our family," as required by the funeral and burial contracts; at the meeting, Beatrice and her family expressed their concern over Maria's body being placed in the casket of another, the funeral home agreed to change the casket, and Beatrice picked out a new one; and Maria was buried pursuant to the funeral and burial contracts on December 21, 2015. Thus, this case is not one in which "the substance of the claim arises from general obligations imposed by state law, including statutes, torts and other common law duties, or federal law" and the claim merely refers to or relates to the contract. *See Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 637 (Tex. 2018) (quoting *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 528 (Tex. 2015)). Nor is this a case which simply would not have arisen "but for" the contract's existence. *See id.*

I would conclude Beatrice and her family's dealings with SIG-TX resemble Von Bargen's dealings with Weekley such that Beatrice and her family should be compelled to arbitrate their claims under a theory of direct-benefits estoppel.[1] *See Weekley*, 138 S.W.3d at 131–35. The fact that Beatrice and the other appellees do not purport to make any claim based on either the funeral contract or the cemetery contract does not persuade me otherwise. Von Bargen also did not purport to make a claim under the Weekley contract. *See id.* at 132. Further, the *Weekley* court acknowledged a contractor such as Weekley had "an independent duty under Texas tort law not to injure bystanders by its activities," just as there may have been an independent duty under Texas tort law to immediate family members not to negligently mishandle a corpse. *See id.*; *Serv. Corp. Intern. v. Aragon*, 268 S.W.3d 112, 117 (Tex. App.—Eastland 2008, pet. denied). The existence

---

[1] In comparison, where a husband individually purchased a car from a dealership under a contract containing an arbitration clause, his wife could not be compelled to arbitrate her personal injury claims arising from her slip and fall on the way to the dealership's toilet when she brought the car in for service. *See Rocha v. Marks Transp., Inc.*, 512 S.W.3d 529, 536–40 (Tex. App.—Houston [1st Dist.] 2016, no pet.). In that case, wife was not bound through direct-benefits estoppel because her complaint that hazardous conditions existed on the dealership's premises did not involve a duty or liability arising from her husband's purchase contract, liability would not be determined by reference to that contract, and the claim arose from general obligations to keep premises safe. *See id.* at 538.

of such an independent duty did not prevent the *Weekley* court from deciding Von Bargen's claims were subject to arbitration, and it should not be determinative of the outcome in this case. *See Weekley*, 138 S.W.3d at 132–35.

I would conclude that, under the facts and circumstances of this case, the trial court abused its discretion in determining that appellees did not deliberately seek and obtain direct benefits from the funeral contracts at issue. Accordingly, I would reverse that part of the trial court's order denying SIG-TX's motion to compel arbitration and remand for entry of an order compelling the underlying case to arbitration.

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

180462DF.P05