**Affirmed and Opinion Filed December 21, 2023**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-00841-CV**

**PAUL PICONE, Appellant**
**V.**
**GARY CRUCIANI AND MCKOOL SMITH, P.C. Appellees**

**On Appeal from the County Court at Law No. 4**
**Dallas County, Texas**
**Trial Court Cause No. CC-21-00300-D**

## MEMORANDUM OPINION

Before Justices Pedersen, III, Garcia, and Kennedy
Opinion by Justice Pedersen, III

Appellant Paul Picone appeals from the trial court's June 28, 2022 final

judgment, which dismissed with prejudice his claims for legal malpractice, breach

of fiduciary duty, and fraud and awarded appellees Gary Cruciani and McKool

Smith, P.C. (together, McKool Smith) attorney's fees, costs, and interest.[1] In two

appellate issues, Picone contends the trial court erred in compelling arbitration and

---

[1] The court's judgment is titled "Order Granting Defendants' Motion to Lift Stay and Confirm Arbitration Award and Denying Plaintiff's Motion to Reconsider Order Compelling Arbitration and Staying Case."

in confirming the arbitrator's award in the absence of an agreement to arbitrate between these parties. We affirm the trial court's judgment.

## Background

The lawsuit before us has complicated roots that involve these parties and a number of others, who have become entangled in business and legal matters over a number of years. For our purposes, we focus upon the legal disputes, representations, and resolutions that lead to the lawsuit and arbitration below.

*2006 Dispute between OSI and Picone and PIC*

Picone owned a company named Photographic Illustrators Corporation (PIC) that licensed his photographs to Osram Sylvania, Inc. (OSI). In 2006, a dispute arose between the parties concerning OSI's use of PIC's photographs outside the scope of the parties' license agreement. Wolf, Greenfield & Sacks (WGS) represented PIC and Picone in their efforts to resolve the dispute. The resulting agreement included a release of claims against OSI, a payment by OSI of $50,000, and new licensing terms by which OSI would pay a monthly royalty to PIC and PIC would provide Picone's photographic and imaging services to OSI (the 2006 Settlement Agreement). The parties agreed to resolve any disputes relating to the 2006 Settlement Agreement through arbitration. An initial recital states that this is an agreement between OSI and PIC, but—after signing for PIC as its president—Picone also signed the following statement:

INSOFAR as this Agreement calls for my personal services and/or deals with rights and/or obligations that I may have personally, I, Paul Picone[,] hereby acknowledge and agree to be bound by this Agreement.

*2016 OSI Arbitration with Picone and PIC*

During the term of the 2006 Settlement Agreement, PIC became aware that copies of PIC Images in which it owned the copyrights were appearing on internet sites belonging to OSI's customers without a PIC copyright notice or attribution. PIC filed a number of copyright infringement actions against OSI's customers in federal courts; the suits were consolidated in Massachusetts. In January 2016, OSI intervened in the consolidated action and moved to refer the contract and copyright disputes between PIC and OSI to arbitration. According to Picone, WGS represented Picone and PIC until approximately "mid-2016," when WGS withdrew.

At approximately the same time, in June 2016, Picone "began to explore the possibility of selling PIC," and he began negotiating with Matt Fleeger to that end. On October 5, 2016, Picone finalized the sale of PIC through a Stock Purchase Agreement with Copyright Strategies, LLC (CSL), a company owned by Fleeger.[2] The Stock Purchase Agreement contained a lengthy provision relating to resolution of disputes between the parties. Initially, any controversy or claim that arose out of the agreement was to be mediated. If the mediation was not successful, then the parties were to proceed to arbitration:

---

[2] Picone's wife, Carolyn Picone, was also a party to the Stock Purchase Agreement. She is not a party to this suit.

> [A]ny controversy or claim arising out of or relating to this Agreement, including but not limited to the arbitrability of any such controversy or claim, between or among the parties hereto and/or any of their respective affiliates shall be resolved by binding arbitration in accordance with JAMS Comprehensive Arbitration Rules and the Federal Arbitration Act by JAMS in the County of the Respondent and judgment upon any award arising in connection therewith may be entered in any court of competent jurisdiction. An award rendered by the arbitrator shall be final and binding.

The Stock Purchase Agreement also included a provision addressing certain claims belonging to Picone and PIC that might not be completely resolved with third parties by the time the sale became effective. The agreement provided that when those claims were ultimately resolved, Picone was entitled to forty percent of the recovery.

Picone contends that "around" August 2016, "shortly after WGS withdrew," he hired McKool Smith to represent himself and PIC in the OSI arbitration. Our record does not include a contract reflecting this representation. Although the Stock Purchase Agreement was not effective until October 5, 2016, Fleeger signed his own agreement with McKool Smith on August 21, 2016, for the firm to represent PIC in the OSI arbitration (the 2016 Retention Agreement). PIC is named as the "Client" in the 2016 Retention Agreement; Fleeger signed as the President of PIC. According to Picone, he was completely unaware of the 2016 Retention Agreement until years later, and Fleeger had no authority to enter into such an agreement when Picone was the sole owner of PIC.

The dispute did proceed to arbitration, and the arbitrator signed his Partial Final Award on November 20, 2017, awarding PIC more than $9.5 million for its

breach of contract claims, plus attorney's fees and costs. But the arbitrator made no award for copyright infringement by OSI based on what he called WGS's failure to employ "language of conditions" when it drafted certain provisions in the 2006 Settlement Agreement. According to Picone, Cruciani told him at the close of the arbitration that a legal malpractice claim existed against WGS based on the findings of the arbitrator.

*2019 WGS Malpractice Mediation*

Picone asserts that sometime between June 1 and June 25, 2019, Cruciani contacted him by telephone and offered to have McKool Smith represent him and PIC on a contingency fee basis in pre-suit negotiations with WGS. Picone contends that he hired McKool Smith on that phone call, but he was never provided a written contract reflecting the representation. Picone also asserts that—after *he* had interviewed and hired McKool Smith—he recommended that Fleeger sign a retention agreement with the firm and that Fleeger pursue the malpractice claim against WGS. Fleeger did sign a second retention agreement with McKool Smith. The agreement called for the firm to act as settlement counsel for PIC—identified as the "Client"—in return for a thirty percent contingency fee; it included a provision requiring disputes to be resolved by arbitration (the 2019 Retention Agreement).

Before litigation was filed against WGS, a mediation of the malpractice claim was held on March 12, 2020. Picone contends that Cruciani told him he was required to attend the mediation. During the mediation, Picone and Fleeger argued over the

distribution of any recovery from WGS: Picone claimed he was entitled to forty percent of the recovery based on the Stock Purchase Agreement; Fleeger asserted that Picone was entitled to nothing. Picone contends that throughout the mediation he continued to believe McKool Smith was representing him individually. Picone claims that Cruciani advised him that he was entitled to the forty percent share of the settlement and that there was no need to reduce that understanding to writing. At the end of the mediation, WGS agreed to settle with Picone and PIC for $15 million, and Picone signed a term sheet to that effect. But the term sheet did not include an express division of the recovery between him and PIC.

Shortly after the mediation, a personal attorney for Picone, David Fernberg, contacted Cruciani; Fernberg asked McKool Smith to retain the WGS settlement proceeds in its client account until Picone and Fleeger could work out their respective shares of the settlement. In response, Cruciani informed Feinberg that Picone was not a client of McKool Smith and that McKool Smith had played no role in the Stock Purchase Agreement and did not wish to be put "in the middle." Several days later, Picone signed an agreement with CSL, which provided for payment of $2.5 million to Picone as his share of the WGS settlement and which included a broad release of claims by both parties (the 2020 Settlement and Release).

*Picone Sues Cruciani and McKool Smith*

Picone sued McKool Smith, pleading claims for legal malpractice, negligence, breach of fiduciary duty, and fraud and fraud in the inducement.[3] The petition attached Picone's declaration, stating that "during a phone conversation with Gary Cruciani, Esq., I hired Gary Cruciani, Esq. and McKool Smith as counsel to represent me individually and PIC regarding the WGS legal malpractice claim." This oral agreement for representation provides the basis of Picone's claim that he had an attorney-client relationship with McKool Smith. Picone's declaration and pleading alleged eleven violations of McKool Smith's duty to him related to its handling of the WGS malpractice claim and mediation.[4] The petition also set forth Picone's damages claim, stating:

---

[3] Picone's fraud pleading alleged that McKool Smith:

made misrepresentations of material facts to [Picone] regarding the representation of [Picone] and the settlement to be signed by [Picone] with positive statements and with concealment and failure to disclose facts when it had a duty to disclose such.

[4] Picone alleged that McKool Smith failed to:

i. Advise me to obtain a writing confirming my entitlement to 40% of any recovery from of the WGS legal malpractice claim per the October 5, 2016 Stock Purchase agreement and Paragraph 10 above;

ii. Advise me to obtain a lawyer separate from that of Copyright Strategies, LLC and PIC to represent my individual interests regarding the WGS legal malpractice claim;

iii. Advise me to enter into a separate, individual fee agreement with Gary Cruciani, Esq. and McKool Smith separate from any agreement between PIC and McKool Smith;

The Two Million Five Hundred Dollar ($2,500,000.00) PICONE received was far less monies than PICONE was owed per Paragraph 11 [of the Stock Purchase Agreement] above.

      a. $15,000,000.00 x 70% = $10,500,000.00

      b. $10,500,000.00 x 40% = $4,200,000.00

McKool Smith answered Picone's lawsuit and moved to compel arbitration, denying that Picone was a client of McKool Smith in the WGS malpractice matter. It argued that Picone's claims had to be arbitrated because both those claims and Picone's purported damages depended upon two agreements that expressly required arbitration: the Stock Purchase Agreement and the 2019 Retention Agreement.

---

iv. Advise me that Gary Cruciani, Esq. and McKool Smith were not representing me individually but were only representing PIC;

v. Provide me, individually, any separate legal fee agreement with Gary Cruciani, Esq. and McKool Smith;

vi. Enter into any separate legal fee agreement with Gary Cruciani, Esq. and McKool Smith with me individually;

vii. Advise me that Gary Cruciani, Esq. and McKool Smith believed that Gary Cruciani, Esq. and McKool Smith did not and would not represent me individually in the WGS legal malpractice claim;

viii. Advise me that I would need a separate lawyer other than Gary Cruciani, Esq. or McKool Smith for my individual protection regarding the WGS legal malpractice claim;

ix. Obtain or direct me to obtain from PIC or Fleeger any additional writings respecting my entitlement to a percentage of the recovery in the legal malpractice claim against WGS;

x. Advise me regarding conflicts between my individual claims and the claims of PIC or Fleeger; or

xi. Present me with a conflict waiver regarding my individual claims and the claims of PIC or Fleeger.

Accordingly, McKool Smith argued that the doctrine of direct benefits estoppel required that Picone's claims be arbitrated.

The trial court granted the motion to compel arbitration on March 10, 2021, based on the doctrine of direct benefits estoppel.[5] The case proceeded to arbitration, where McKool Smith filed a counterclaim, pleading that Picone's suit against it was a breach of the covenant not to sue in the 2020 Settlement and Release. The arbitrator ultimately determined that Picone's claims were barred by the release that Picone gave in that 2020 Settlement and Release.

The trial court granted McKool Smith's motion to lift the stay and to confirm the arbitrator's award and denied Picone's motion to reconsider the propriety of compelling arbitration. This appeal followed.

## Discussion

Picone raises two issues based on the same straightforward legal argument: a party seeking to compel arbitration must establish that the dispute in question falls within the scope of a valid arbitration agreement. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003). Picone argues that because he never signed an agreement to arbitrate disputes with McKool Smith, the trial court erroneously compelled the parties to arbitration and erroneously confirmed the arbitrator's award. "'But sometimes a person who is not a party to the agreement can compel

---

[5] Our record does not include this order. But at the post-arbitration hearing, the trial judge stated on the record that she had ordered the case to arbitration based on direct benefits estoppel.

–9–

arbitration with one who is, and vice versa.'" *Lennar Homes of Tex. Land & Constr., Ltd. v. Whiteley*, 672 S.W.3d 367, 376 (Tex. 2023) (quoting *Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 305 (Tex. 2006)). We conclude that this is one of those times.

*Compelling Arbitration*

The Texas Supreme Court has recognized that when a litigant sues based on a contract, it subjects itself to the contract's terms, including an arbitration provision. *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 527 (Tex. 2015). The rule is an equitable one: a litigant cannot "on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Id.* Thus, if a non-signatory claimant seeks "direct benefits" under a contract that contains an arbitration agreement, the claimant may be compelled to arbitrate under that contract. *Id.* This standard is not met by a claim that merely "relates to" the contract that contains the arbitration agreement. *Id.* Nor is the standard met by claims when liability arises solely from general obligations imposed by law. *Id.* at 528. "[T]he claim must depend on the existence of the contract . . . and be unable to stand independently without the contract." *Id.* at 527–28. We determine whether a claim seeks a direct benefit from a contract containing an arbitration clause by analyzing the substance of the claim. *Id.* at 527.

McKool Smith contends that Picone depends upon both the 2019 Retention Agreement and the Stock Purchase Agreement to state his claim. Picone argues that—at most—his claim against McKool Smith "relates to" these other agreements, but the claim actually "arose from general obligations imposed by state law, including statutes, torts and other common law duties." *See Jody James Farms, JV v. Altman Group, Inc.*, 547 S.W.3d 624, 637 (Tex. 2018) (direct benefits estoppel may not be implicated if substance of claim arises solely from general obligations imposed by state law, including statutes, torts and other common law duties, or federal law).

We first address the 2019 Retention Agreement between PIC and McKool Smith. Picone asserted below and continues to insist in this Court that he does not contend that he is McKool Smith's client based on that 2019 Retention Agreement. Instead, he claims client status based on the oral agreement he reached with Cruciani in June of 2019. Picone's pleading of his damages does begin with the understanding that McKool Smith would be taking a thirty percent contingency fee from the WGS settlement recovery. The record is not clear as to the source of Picone's assumption concerning the amount of McKool Smith's contingency interest: perhaps he employed the figure from the 2019 Retention Agreement, or perhaps it was the percentage Picone agreed to in his oral agreement. Regardless, even if Picone's damages model draws its thirty percent contingency figure from the 2019 Retention Agreement, we cannot conclude that this mere reference to a percentage amount in

–11–

an agreement can suffice to bind Picone to the agreement's arbitration clause. *See, e.g., G.T. Leach Builders, LLC*, 458 S.W.3d at 527 (not sufficient to invoke direct benefits estoppel when party's claim merely "relates to" contract containing arbitration agreement).

The parties' relationship to the Stock Purchase Agreement is a different matter. At the outset, Picone is a party to the agreement. And his claims against McKool Smith do not merely refer to the Stock Purchase Agreement; they are in fact dependent upon that agreement. Picone contends that he hired the firm to represent him and PIC to attempt to settle the WGS malpractice claim. WGS's malpractice resulted in Picone's and PIC's being denied recovery for copyright infringement by OSI. And although Picone no longer owned PIC in 2019, he claimed an individual right to compensation based upon the term of the Stock Purchase Agreement concerning later-resolved claims against third parties. Picone identifies no other legal reason why he had a right to forty percent of his former company's recovery from WGS.

Just as the damages Picone claims in this suit are defined by the Stock Purchase Agreement, so is the malpractice with which he charges McKool Smith. Picone's first allegation of the firm's wrongdoing avers that it failed to:

> [a]dvise me to obtain a writing confirming my entitlement to 40% of any recovery from of the WGS legal malpractice claim per the October 5, 2016 Stock Purchase Agreement.

First and foremost, then, Picone alleges that McKool Smith breached its fiduciary obligation to assist him in obtaining what he was due under the Stock Purchase Agreement. His subsequent complaints speak to the firm's failure to represent his individual interests as opposed to those of PIC and its owner CSL, i.e., the entities with competing interests to his own based on the Stock Purchase Agreement.

We are not tasked with resolving any of the many legal issues that underlie these parties' relationship and Picone's claims. The question before us is a limited one:  did the trial court abuse its discretion in ordering these parties to arbitration? Our resolution of the question is similarly limited by the facts and arguments before us. We conclude that Picone's lawsuit against McKool Smith seeks a direct benefit of the Stock Purchase Agreement. His claims—and McKool Smith's liability—depend upon the existence of that agreement and are unable to stand independently without it. *See G.T. Leach Builders, LLC*, 458 S.W.3d at 527–28. Accordingly, Picone may not avoid the arbitration clause that governs the Stock Purchase Agreement. The trial court did not abuse its discretion by ordering these parties to arbitration. We overrule Picone's first issue.

*Confirming the Arbitration Award*

Picone's second issue argues that the trial court erroneously confirmed the arbitrator's award. His argument again is based on the absence of an agreement between him and McKool Smith to arbitrate their disputes in this lawsuit. We have concluded that the trial court did not abuse its discretion in ordering the parties to

–13–

arbitration in the first instance based on the doctrine of direct benefits estoppel. We address under this second issue the matters that arose during arbitration involving the 2020 Settlement and Release.[6]

Initially, Picone complains that McKool Smith's counterclaim involving the covenant not to sue was made part of the arbitration. The 2020 Settlement and Release does not include an arbitration provision. But McKool Smith argues that its claim was a compulsory counterclaim, inextricably enmeshed with Picone's malpractice claims. *See Gray v. Ward*, No. 05-18-00266-CV, 2019 WL 3759466, at *3 (Tex. App.—Dallas Aug. 9, 2019, no pet.) (claim is arbitrable if facts alleged touch matters, have significant relationship to, are inextricably enmeshed with, or are factually intertwined with agreement that includes arbitration provision). As we have discussed, Picone hired McKool Smith to pursue the benefit he was due under the Stock Purchase Agreement. He alleges that the firm committed malpractice during this representation, specifically surrounding the mediation of that dispute. McKool Smith, in turn, charges that Picone has violated the parties' agreed resolution of that mediation. We conclude that McKool Smith's allegations are factually intertwined with Picone's malpractice claims. Accordingly, those allegations were within the scope of the arbitration pending between the parties. *See*

---

[6] Picone has not challenged the arbitrator's decision that his claims are barred by the release in the 2020 Settlement and Release.

–14–

*Ascendant Anesthesia PLLC v. Abazi*, 348 S.W.3d 454, 462 (Tex. App.—Dallas 2011, no pet.).

Picone's final argument relies on the venue provision found in the 2020 Settlement and Release, which states:

> Venue for any action arising under this Agreement shall be exclusively in the courts (federal or state) located in Dallas County, Texas.

Picone characterizes this provision as a "dispute resolution agreement" that requires claims based on the agreement to be decided by the trial courts of Dallas County. He contends that this provision superseded any prior arbitration agreement that could govern these parties' disputes. We disagree.

Black's Law Dictionary defines "venue" as:

> **1.** The proper or a possible place for a lawsuit to proceed, usu. because the place has some connection either with the events that gave rise to the lawsuit or with the plaintiff or defendant. **2.** The territory, such as a country or other political subdivision, over which a trial court has jurisdiction. **3.** Loosely, the place where a conference or meeting is being held. **4.** In a pleading, the statement establishing the place for trial. **5.** In an affidavit, the designation of the place where it was made.

Venue, *Black's Law Dictionary* (11th ed. 2019). The concept of venue speaks to the place where a lawsuit is to proceed. *See id.* It does not speak to the manner in which a dispute will be resolved. Nor is a provision calling for venue in Dallas County courts mutually exclusive from an arbitration provision: even if the parties agree to arbitrate their differences, a court must confirm the arbitrator's award, and a venue provision determines where that confirmation will take place. The venue provision

in the 2020 Release and Settlement has no bearing on the arbitrability of any claim between these parties.[7]

The trial court did not abuse its discretion by confirming the arbitration award. We overrule Picone's second issue.

## Conclusion

We affirm the trial court's judgment.

<table>
<tr><td></td><td>/Bill Pedersen, III//</td></tr>
<tr><td>220841f.p05</td><td>BILL PEDERSEN, III<br>JUSTICE</td></tr>
</table>

---

[7] To underscore this point, we note that the Stock Purchase Agreement's arbitration provision ends with the following statement assigning venue for proceedings required to take place in court:

> Notwithstanding anything in this Section 8.07 to the contrary, the parties hereto shall have the right to commence litigation or other legal proceedings with respect to any claims relating solely to: (i) emergency or injunctive relief, or (ii) enforcement of the dispute resolution provisions of this Agreement and/or any arbitration award. Venue for any and all such litigation shall be in the courts situated in the County of the Respondent.



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

PAUL PICONE, Appellant

No. 05-22-00841-CV     V.

GARY CRUCIANI AND MCKOOL
SMITH, PC, Appellees

On Appeal from the County Court at
Law No. 4, Dallas County, Texas
Trial Court Cause No. CC-21-00300-
D.
Opinion delivered by Justice
Pedersen, III. Justices Garcia and
Kennedy participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees Gary Cruciani and McKool Smith, PC recover their costs of this appeal from appellant Paul Picone.

Judgment entered this 21st day of December, 2023.