**Reversed and Remanded and Majority Memorandum Opinion and Memorandum Dissenting Opinion filed March 14, 2024.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-22-00641-CV

---

## ELITE TOWNHOMES, LLC AND SOUHAIL H. ADAM, Appellants

## V.

## INTOWN CONSTRUCTION GROUP, LLC, Appellee

---

**On Appeal from the 234th District Court
Harris County, Texas
Trial Court Cause No. 2022-06530**

---

## M A J O R I T Y   M E M O R A N D U M   O P I N I O N

An owner and its representative appeal the trial court's interlocutory order denying their motion to compel arbitration of claims asserted against them by the general contractor on a construction project. Applying the Supreme Court of Texas's recent opinion in *TotalEnergies E&P USA, Inc. v. MP Gulf of Mexico,*

*LLC*,[1] we conclude that the trial court erred in denying the motion to compel and in failing to enforce the delegation provision contained in two arbitration provisions in contracts signed by the owner and the general contractor. We reverse and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The claims in the trial court arise out of two construction projects in Houston. Appellant/defendant Elite Townhomes, LLC ("Elite") was the owner on the projects. Appellant/defendant Souhail H. Adam is an officer and the 100% owner of Elite as well as Elite's authorized representative. Appellee/plaintiff Intown Construction Group, LLC ("Intown") was the general contractor on the projects and provided construction services to Elite.

Intown sued Elite and Adam (collectively the "Elite Parties") in the trial court below asserting claims for breach of contract, common law fraud, fraudulent inducement, statutory fraud under section 27.01 of the Business and Commerce Code, quantum meruit, and promissory estoppel. Intown alleges that in 2013 it entered into and invested in joint ventures with the Elite Parties for the construction of residential townhome developments, specifically, the Ennis Street Project and the Yale Street Project. Intown contends that the Elite Parties owe Intown substantial amounts of money in connection with those agreements, and alternatively, based on the Elite Parties' fraud, or based on Intown's provision of services, labor, and materials to the Elite Parties.

According to Intown, the Ennis Street Project was conceived as a joint venture between Intown and the Elite Parties, consisting of 40 upscale townhomes within a bounded development in Houston's East Downtown area. Intown alleges

---

[1] 667 S.W.3d 694 (Tex. 2023).

that, beginning with the formation of its joint venture with the Elite Parties in 2013, Intown worked on the ideas and costs pertaining to the Ennis Street Project, schematics, construction documents, permits, and provided skilled labor and professional services. Intown claims that it was not directly compensated for these years of work. Intown contends that it entered into contracts with subcontractors, vendors, professionals and miscellaneous service providers pertaining to the Ennis Street Project, and that these services and contracts were based on the development of 40 homes in the Ennis Street Project, in accordance with the agreement between Intown and the Elite Parties. Intown alleges that these skilled and professional services, as well as the provision of some materials, were performed by Intown without any recoupment or monetary compensation from the Elite Parties. Intown asserts that, instead, based on the parties' oral agreements and the Elite Parties' representations, in exchange for its years of skilled work and professional services in developing the project, and Intown's services in developing the common infrastructure and acting as the sole general contractor and builder for the project, Intown was to be paid a $25,000 builder fee on each of the 40 homes, for a total of $1,000,000. Intown also alleges that it was promised the opportunity to invest in the construction of certain units.

In connection with the Ennis Street Project, Intown and Elite signed two construction contracts on forms promulgated by the American Institute of Architects ("AIA"). The parties signed the first contract in 2017 ("2017 Contract"), and this contract governed the construction of townhomes on six of Elite's lots in the Ennis Street Project. The parties signed the second contract in 2019 ("2019 Contract"), and this contract governed the construction of townhomes on three of Elite's lots in the Ennis Street Project. Both the 2017 and the 2019 Contracts (collectively "the Contracts") contain arbitration provisions. In its live pleading,

Intown repeatedly asserts that the other 31 lots in the Ennis Street Project are not within the scope of the arbitration provisions in the Contracts and that Intown's claims relate solely to these 31 lots. According to Intown, it makes no claims relating in any way to the nine lots mentioned in the Contracts.

Intown alleges that on or about June 7, 2021, the Elite Parties suddenly terminated their agreements with Intown and excluded it from the Ennis Street Project, thereby denying Intown its agreed building fees on the last ten homes and its 100% profit share on five of those homes. Intown alleges that Elite obtained financing by representing to a bank that although Intown built the first 30 units, the Elite Parties now possessed the experience, wherewithal and capacity to develop the last 10 units of the 40-unit project. According to Intown, once the Elite Parties obtained the financing, they abruptly hired the Elite Parties' subcontractors' team to finish the last ten homes using all of the contracts, leg work, infrastructure, schematics, permits, and other work product painstakingly produced by Intown's hard work since 2013. As to all damages allegedly suffered by Intown due to the Elite Parties' wrongful and tortious conduct with respect to the Ennis Street Project, Intown seeks at least $1,001,807.88 from the Elite Parties, plus pre-judgment and post-judgment interest, attorney fees, and costs of court. Further, given the Elite Parties' alleged fraud and malice, Intown seeks exemplary damages of two times its economic damages plus an amount equal to any noneconomic damages found by the jury (such noneconomic portion not to exceed $750,000).

As to the Yale Street Project, Intown alleges that the Elite Parties have refused to pay Intown at least $10,500 for services rendered by Intown under a contract with the Elite Parties. Intown seeks damages of at least $10,500 plus pre-judgment interest, post-judgment interest, attorney fees, and costs of court.

The Elite Parties filed an amended motion to compel arbitration of all claims

4

against them relating to the Ennis Street Project (the "Motion"), asserting that (1) the parties agreed that the Federal Arbitration Act ("FAA") governs the arbitration agreed to in the arbitration provisions of the Contracts, and the Texas Arbitration Act also applies to the extent it is not inconsistent with the FAA; (2) each of the Contracts incorporate the arbitration provisions of AIA Document A201–2007 (the "General Conditions"), requiring certain pre-arbitration dispute resolution procedures, and if those proceedings are unsuccessful, binding arbitration administered by the American Arbitration Association in accordance with its Construction Industry Arbitration Rules ("AAA Construction Rules"); (3) by incorporating Rule R-9 of the AAA Construction Rules ("Rule R-9") into the arbitration provisions of each of the Contracts, the parties clearly and unmistakably agreed to arbitrate arbitrability issues, and thus the determination as to whether Intown's claims fall within the scope of the arbitration provisions in the Contracts is a matter for the arbitrator to decide, not the courts; (4) each of the Contracts requires the arbitration of claims arising out of or relating to the contract; (5) in the alternative, even if the arbitrator does not determine arbitrability issues, Intown's claims against the Elite Parties arise out of or relate to the Contracts and thus fall within the scope of the arbitration provisions; and (6) Elite's owner and representative, Adam, may compel Intown to arbitrate under various theories, including under the Supreme Court of Texas's opinion in *In re Rubiola*, 334 S.W.3d 220 (Tex. 2011). In the Motion, the Elite Parties also moved under section 171.025 of the Civil Practice and Remedies Code for a stay of the proceeding pending arbitration.

Intown opposed the Motion, asserting that (1) the Contracts only apply to nine of the forty townhomes in the Ennis Street Project; (2) for the other 31 townhomes, Intown and the Elite Parties had completely separate agreements; (3) Intown's claims are made in connection with the 31 townhomes not covered by the

Contracts and are not related to either of the Contracts; (4) Intown's claims against the Elite Parties do not arise out of or relate to either of the Contracts, as is made clear by Intown's First Amended Petition, and thus these claims are not within the scope of the arbitration agreements in the Contracts; (5) the parties did not agree to arbitrate claims arising in connection with the 31 townhomes not covered by the Contracts; (6) because Intown's claims are not within the scope of the arbitration agreements in the Contracts, the AAA Construction Rules do not apply, and therefore an arbitrator does not determine the scope of these arbitration agreements; and (7) the courts have the power to determine the scope of these arbitration agreements. Intown did not challenge the validity of Rule R-9.

After a hearing, the trial court signed an order denying the Motion. The Elite Parties timely perfected an interlocutory appeal from this order. See 9 U.S.C. §16; Tex. Civ. Prac. & Rem. Code Ann. §51.016 (West, Westlaw through 2023 2d. C.S.).

## II. ISSUES AND ANALYSIS

### A. Did the trial court err in denying the Motion because the parties entered into two arbitration agreements that incorporated Rule R-9, which delegates to the arbitrator the determination as to whether Intown's claims are within the scope of each arbitration agreement?

Under their first issue, the Elite Parties argue that the trial court erred in denying the Motion because Intown and Elite undisputedly entered into the Contracts, each of which contains an arbitration agreement and because the parties incorporated Rule R-9, which delegates to the arbitrator the determination of arbitrability issues such as whether any of Intown's claims fall within the scope of either arbitration agreement. A dispute over whether parties agreed to resolve their controversies through arbitration often encompasses three distinct disagreements: (1) the merits of the underlying controversy, (2) whether the merits must be

6

resolved through arbitration instead of in the courts, and (3) who (a court or the arbitrator) decides the second question. *TotalEnergies E&P USA, Inc. v. MP Gulf of Mexico, LLC*, 667 S.W.3d 694, 701 (Tex. 2023). The second question must be answered before the first, and the third must be answered before the second. *Id*. So we begin with the third question. *See id*.

### 1.    Applicable Law

Basic contract law governs our resolution of the third question. *Id*. Because arbitration is a matter of contract, parties cannot be compelled to arbitrate any controversy unless they have contractually agreed to do so. *Id*. An agreement to arbitrate controversies is severable from a broader contract that contains it, and courts must consider the two separately. *Id*. When a party challenges the validity of the broader contract but not of an arbitration agreement contained within that contract, courts must enforce the arbitration agreement and require the arbitrator to decide the challenge to the broader contract. *Id*. But when a party challenges the validity or scope of an arbitration agreement contained within a broader contract, courts generally must resolve that challenge to determine whether the parties agreed to arbitrate their controversies regarding the contract.[2] *Id*.

But courts have recognized an important exception to this severability rule. *Id*. at 702. Because arbitration is a matter of contract, parties may agree that arbitrators, rather than courts, must resolve disputes over one or more of the arbitrability issues, such as the validity, scope, and enforceability of their arbitration agreement.[3] *Id*. If the parties have agreed to delegate disputes regarding

---

[2] There are exceptions to this general rule. *See TotalEnergies E&P USA, Inc.*, 667 S.W.3d at 701, n.5, 702.

[3] Arbitrability issues include issues going to the validity, scope, or enforceability of the arbitration agreement. *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 519 (Tex. 2015).

an arbitrability issue to the arbitrator, courts must enforce that agreement just as they must enforce an agreement to delegate resolution of the underlying merits to the arbitrator. *Id*. The Supreme Court of the United States has held that a court must enforce an agreement to delegate arbitrability issues to the arbitrator even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is "wholly groundless." *See Henry Schein, Inc. v. Archer and White Sales, Inc.*, 586 U.S.—,—, 139 S.Ct. 524, 529, 202 L.Ed.2d 480 (2019); *TotalEnergies E&P USA, Inc.*, 667 S.W.3d at 703–04. If the parties did not agree to submit any arbitrability issues to arbitration, then the court should independently decide any arbitrability issues just as the court would decide any other issue the parties did not submit to arbitration. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995); *TotalEnergies E&P USA, Inc.*, 667 S.W.3d 702.

For the most part, the determination of whether parties have agreed to delegate arbitrability issues to an arbitrator is governed by "ordinary state-law principles that govern the formation of contracts." *TotalEnergies E&P USA, Inc.*, 667 S.W.3d 702 (quoting *First Options of Chicago, Inc.*, 514 U.S. at 944, 115 S.Ct. at 1924). But because parties often might not realize the significance of having arbitrators decide the scope of their own powers, and to avoid the risk of requiring parties to arbitrate a dispute they have not agreed to arbitrate, courts will only enforce an agreement to delegate an arbitrability issue to the arbitrator if that agreement is "clear and unmistakable." *TotalEnergies E&P USA, Inc.*, 667 S.W.3d 702.

If an arbitration agreement provides that the arbitration shall be administered by the American Arbitration Association in accordance with the AAA Construction Rules in effect on the date of the agreement, then the parties have

incorporated the AAA Construction Rules in effect on the date of their agreement into their arbitration agreement, and these rules are a part of the parties' agreement as if they were set forth within the agreement itself. *See TotalEnergies E&P USA, Inc.*, 667 S.W.3d 709. Absent any conflict between these rules and the rest of the agreement, these rules are binding. *See id.* A rule providing that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim" clearly and unmistakably delegates the determination of arbitrability issues to the arbitrator. *See id.* at 710–11.

As a general rule, an agreement to arbitrate disputes in accordance with rules providing that the arbitrator shall have the power to determine arbitrability incorporates those rules into the agreement and clearly and unmistakably demonstrates the parties' intent to delegate arbitrability issues to the arbitrator.[4] *See id.* at 712. Though the parties may agree to limit their delegation of arbitrability issues to the arbitrator to only certain claims or controversies or to only certain arbitrability issues, limitations on the scope of the arbitration agreement do not limit the delegation of arbitrability issues to the arbitrator. *See id.* The fact that the parties' arbitration agreement may cover only some disputes while carving out others does not affect the fact that the delegation provision clearly and unmistakably requires the arbitrator to decide whether the present disputes must be

---

[4] The *TotalEnergies* court abrogated a line of precedent from this court requiring a broad arbitration clause before the incorporation of a provision giving the arbitrator the "power to rule on . . . any objections with respect to the existence, scope[,] or validity of the arbitration agreement" would constitute clear and unmistakable evidence of the parties' intent to delegate arbitrability issues to the arbitrator. *See TotalEnergies E&P USA, Inc.*, 667 S.W.3d 708 & n.19, *abrogating in part*, *Berry Y&V Fabricators, LLC v. Bambace*, 604 S.W.3d 482, 487 (Tex. App.—Houston [14th Dist.] 2020, no pet.), *and Trafigura Pte. Ltd. v. CNA Metals Ltd.*, 526 S.W.3d 612, 618 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

resolved through arbitration. *See id*. at 719. If a provision clearly and unmistakably delegates the determination of the arbitrability of the claims at issue to the arbitrator, the delegation provision is severable from the broader arbitration agreement, and courts must enforce the delegation provision and require the arbitrator to decide whether the parties agreed to arbitrate the claims at issue, unless the party opposing arbitration successfully challenges the validity of the delegation provision itself. *See id*. at 718–19.

### 2.  *The Language of the Arbitration Agreements*

Intown does not dispute that it signed each of the Contracts. In section 13.1 of the General Conditions in each Contract, the parties agree that the FAA shall govern the arbitration provisions of the contract. In section 13.2 of each of the Contracts, the parties agree that "[f]or any Claim subject to, but not resolved by, mediation pursuant to Section 15.3 of [the General Conditions], the method of binding dispute resolution shall be as follows: . . . Arbitration pursuant to Section 15.4 of [the General Conditions]." In each Contract, the parties define a "Claim" as "a demand or assertion by one of the parties seeking, as a matter of right, payment of money, or other relief with respect to the terms of the Contract." The parties also agree that the term "Claim" "includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract." In section 15.4.1 of the General Conditions in each of the Contracts, the parties agree that "any Claim subject to, but not resolved by, mediation shall be subject to arbitration which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Arbitration Rules in effect on the date of the Agreement." On the date of each of the Contracts, Rule R-9 was in effect as part of the AAA Construction Rules. Subsection (a) of Rule R-9 provides as follows: "[t]he

arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement."[5] *San Antonio River Auth. v. Austin Bridge & Road, L.P.*, 601 S.W.3d 616, 626 (Tex. 2020).

### 3. *Application of the TotalEnergies Precedent*

The recent opinion from the Supreme Court of Texas in the *TotalEnergies* case is on point, and under the doctrine of vertical stare decisis we are bound to apply this precedent to today's appeal. *See TotalEnergies E&P USA, Inc.*, 667 S.W.3d at 701–20; *Mitschke v. Borromeo*, 645 S.W.3d 251, 256 (Tex. 2022). The language of Rule R-9 is substantially similar to the language of Rule 7(a) of the AAA Commercial Rules applied by the *TotalEnergies* court. *See TotalEnergies E&P USA, Inc.*, 667 S.W.3d at 700. The parties to each of the Contracts incorporated the AAA Construction Rules in effect on the date of their agreement into their arbitration agreement, and these rules are a part of the parties' agreement as if they were set forth within the agreement itself. *See id*. at 709. Because Rule R-9 does not conflict with the rest of each Contract, Rule R-9 is binding. *See id*. Rule R-9 clearly and unmistakably delegates the determination of arbitrability issues to the arbitrator. *See id*. at 710–11. Under the unambiguous language of each of the Contracts, the parties did not agree to limit their delegation of arbitrability issues to the arbitrator to only certain claims or to only certain arbitrability issues. Because Rule R-9 clearly and unmistakably delegates the determination of the arbitrability of Intown's claims to the arbitrator, Rule R-9 is severable from the

---

[5] *See* Am. Arbitration Ass'n, Construction Industry Arbitration Rules and Mediation Procedures, R-9(a), (2015), https://www.adr.org/sites/default/files/ConstructionRules_Web.pdf (last accessed Jan. 12, 2024).

broader arbitration agreement. *See id*. at 718–19. Because Intown has not asserted any challenge to the validity of Rule R-9 itself, courts must enforce this delegation provision and require the arbitrator to decide whether the parties agreed to arbitrate Intown's claims. *See id*.

Intown argues that the language of Rule R-9 simply grants the arbitrator the non-exclusive ability to rule on arbitrability issues without precluding courts from ruling on these issues. The *TotalEnergies* court concluded that a provision from the AAA Commercial Rules with substantially similar language clearly and unmistakably delegated to the arbitrator the exclusive power to determine arbitrability issues. *See id*. at 710–11.

Intown also asserts that (1) none of the properties that were the subject of the Contracts are involved in this dispute; (2) the Contracts are not related to the oral representations on which Intown's claims are based; (3) Intown's claims relate solely to work that was unquestionably not part of either of the Contracts; (4) Intown's claims are not related to the Contracts; and (5) none of Intown's claims fall within the scope of the arbitration provisions of either of the Contracts. None of these points address the delegation provision, Rule R-9. *See id*. at 712–14. All of these points address the alleged scope of the arbitration provisions in the Contracts, but the scope of the arbitration provisions is an issue that goes to which claims are arbitrable rather than to the delegation provision and who decides arbitrability issues. *See id.* The *TotalEnergies* court emphasized that courts must carefully distinguish between the parties' disputes over (1) the scope of the arbitration provision (what it includes and carves out) and (2) the delegation  provision (who decides the scope of the arbitration provision). *See id.* at 717. These arguments by Intown dispute the Elite Parties' contentions as to the former issue, not as to the latter. *See id.* at 712–14, 717. Intown also asserts that the parties did not agree to

12

arbitrate the claims at issue in this case, and that the arbitration provisions of the Contracts should be construed to cover separate and distinct transactions not at issue in this case. Though Intown seeks to cast this argument as addressing the existence of an agreement to arbitrate, the substance of this argument is an argument that Intown's claims do not fall within the scope of the arbitration provision of each of the Contracts. Again, such arguments do not defeat the enforcement of a delegation provision. *See id.* at 712–14, 717.

Intown also relies upon this court's opinion in *Cash America Pawn LP v. Meza. See* 653 S.W.3d 340, 343–44 (Tex. App.—Houston [14th Dist.] 2022, no pet.). This court decided *Cash America* before the Supreme Court of Texas issued its opinion in the *TotalEnergies* case. *See TotalEnergies E&P USA, Inc.*, 667 S.W.3d at 701–20; *Cash America Pawn LP*, 653 S.W.3d at 343–44. The *Cash America* court did not apply the legal standard articulated by the *TotalEnergies* court that we must apply in today's case. *See TotalEnergies E&P USA, Inc.*, 667 S.W.3d at 701–20; *Cash America Pawn LP*, 653 S.W.3d at 343–44. Thus, the *Cash America* case is not on point.

The Elite Parties established as a matter of law the existence of arbitration agreements in each of the Contracts. Because Intown has not asserted any challenge to the validity of Rule R-9 itself, the trial court was duty-bound to enforce the delegation provision in Rule R-9, compel arbitration of Intown's claims against Elite relating to the Ennis Street Project, and require the arbitrator to decide whether the parties agreed to arbitrate Intown's claims against Elite relating to the Ennis Street Project. *See id*. at 718–20. The trial court erred in failing to do so. *See id*. Therefore, we sustain the Elite Parties' first issue.[6]

---

[6] Because we sustain the first issue, we need not address the second issue.

#### 4. *Intown's Claims Against Adam*

Under their third issue, the Elite Parties argue that the trial court erred by failing to compel arbitration of Intown's claims against Adam under the express terms of the Contracts because (1) the parties agree in section 2.1.1 of the General Conditions that the term "Owner" means the "Owner [Elite] or the Owner's authorized representative" and (2) section 15.3 of the 2017 Contract expressly identifies Adam as the "Owner's representative."[7]

We presume that under the *Jody James Farm* case, Rule R-9 in the Contracts does not delegate to the arbitrator the determination as to whether non-signatory Adam may compel arbitration of Intown's claims against him. *See Jody James Farms, JV v. Altman Group, Inc.*, 547 S.W.3d 624, 631–33 (Tex. 2018); *see also TotalEnergies E&P USA, Inc.*, 667 S.W.3d at 703, n.10 (indicating that the Supreme Court of Texas may be inclined to reconsider the part of the *Jody James Farms* opinion cited in the previous citation). Under the FAA, ordinary principles of state contract law determine whether there is a valid agreement to arbitrate. *In re Rubiola*, 334 S.W.3d 220, 224 (Tex. 2011). An obligation to arbitrate not only attaches to one who has personally signed the written arbitration agreement but may also bind a non-signatory under principles of contract law and agency. *Id*. The question of who is bound by an arbitration agreement is a function of the intent of the parties, as expressed in the terms of the arbitration agreement. *Id*. Here, the question is not whether a non-signatory may be compelled to arbitrate, but rather whether a non-signatory may compel arbitration of the claims asserted against him by a party to the arbitration agreements. If an agreement containing an arbitration provision provides that a non-signatory is considered a party to the agreement, then that non-signatory may compel arbitration of claims against the non-signatory to

---

[7] Adam executed each of the Contracts on behalf of Elite.

the extent the claims otherwise must be arbitrated. *See id*. at 224–25; *Branch Law Firm L.L.P. v. Osborn*, 532 S.W.3d 1, 13 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). The parties agree in section 2.1.1 of the General Conditions that the term "Owner" means the "Owner or the Owner's authorized representative." Under the unambiguous language of each of the Contracts, we conclude that the "Owner's authorized representative" is included in the definition of "Owner," and thus is a party to the each of the Contracts. *See In re Rubiola*, 334 S.W.3d at 224–25; *Branch Law Firm L.L.P.*, 532 S.W.3d at 13–18. Because Adam was Elite's authorized representative, Adam may compel arbitration of claims against him to the extent the claims otherwise must be arbitrated. *See In re Rubiola*, 334 S.W.3d at 224–25; *Branch Law Firm L.L.P.*, 532 S.W.3d at 13–18. Treating Adam as a party to the Contracts, for the same reasons stated above as to Elite, the trial court erred in failing to (1) enforce the delegation provision in Rule R-9, (2) compel arbitration of Intown's claims against Adam relating to the Ennis Street Project, and (3) require the arbitrator to decide whether the parties agreed to arbitrate Intown's claims against Adam relating to the Ennis Street Project. *See TotalEnergies E&P USA, Inc.*, 667 S.W.3d at 718–20. Therefore, we sustain the Elite Parties' third issue.

## B. Did the trial court err in denying the motion to stay contained in the Motion?

The Elite Parties assert that the trial court erred in denying the motion to stay they asserted in the Motion. An order compelling arbitration must include a stay of any proceeding subject to section 171.025. *See* Tex. Civ. Prac. & Rem. Code Ann. § 171.021(c) (West, Westlaw through 2023 2d. C.S.). The trial court shall stay a proceeding that involves an issue subject to arbitration if the trial court issues an order compelling arbitration. *See id*. § 171.025(a) (West, Westlaw through 2023 2d. C.S.). This stay applies only to the issue subject to arbitration if that issue is

severable from the remainder of the proceeding. *See id.* § 171.025(b) (West, Westlaw through 2023 2d. C.S.). Because the trial court should have compelled arbitration as to Intown's claims against the Elite Parties relating to the Ennis Street Project (the "Ennis Street Claims"), the trial court also should have stayed the proceeding as to all these claims. *See id.* §§ 171.021(c), 171.025(a); *LDF Construction, Inc. v. Texas Friends of Chabad Lubavitch, Inc.*, 459 S.W.3d 720, 725, 732 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *In re H&R Block Fin. Advisors*, 262 S.W.3d 896, 903 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding). Thus, the trial court erred in failing to stay the proceeding as to the Ennis Street Claims pending arbitration. *See* Tex. Civ. Prac. & Rem. Code Ann. § 171.021(c); *LDF Construction, Inc.*, 459 S.W.3d at 725, 732; *In re H&R Block Fin. Advisors*, 262 S.W.3d at 903. On appeal the parties have not addressed whether the Ennis Street Claims are severable from the remainder of the proceeding, and if severable, whether the proceeding should be stayed as to Intown's claims against the Elite Parties relating to the Yale Street Project (the "Yale Street Claims"). *See* Tex. Civ. Prac. & Rem. Code Ann. § 171.025(b); *Zaporozhets v. Court Appointed Receiver in Cause No. 12-DCV-199496*, No. 14-14-00143-CV, 2014 WL 5148151, at *9 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.) (mem. op.). Therefore, we instruct the trial court on remand to determine whether the proceeding should be stayed pending arbitration as to the Yale Street Claims. *See* Tex. Civ. Prac. & Rem. Code Ann. § 171.025(b); *Zaporozhets*, 2014 WL 5148151, at *9.

### III. CONCLUSION

The "Owner's authorized representative" is included in the definition of "Owner" in the Contracts and thus is a party to the Contracts. Because Adam was Elite's authorized representative, Adam may compel arbitration of claims against

16

him to the extent the claims otherwise must be arbitrated. The Elite Parties established as a matter of law the existence of arbitration agreements in each of the Contracts. Because Intown has not asserted any challenge to the validity of Rule R-9 itself, the trial court was duty-bound to enforce the delegation provision in Rule R-9, compel arbitration of the Ennis Street Claims, and require the arbitrator to decide whether the parties agreed to arbitrate the Ennis Street Claims. Therefore, the trial court erred in denying the Motion.

We reverse the trial court's order and remand with instructions to the trial court to (1) determine whether the proceeding should be stayed pending arbitration as to the Yale Street Claims; and (2) issue an order (a) granting the Motion, (b) compelling arbitration of the Ennis Street Claims, (c) requiring the arbitrator to decide whether the parties agreed to arbitrate the Ennis Street Claims, (d) staying the proceeding as to the Ennis Street Claims pending arbitration, and (e) staying the proceeding as to the Yale Street Claims pending arbitration, if the trial court determines that the proceeding should be stayed as to these claims pending arbitration.


/s/    Randy Wilson
Justice

Panel consists of Justices Spain, Poissant, and Wilson (Spain, J., dissenting).